Per Curiam :
This case was referred pursuant to former Buie 45(a) (now Buie 57(a)) to Trial Commissioner W. Ney Evans, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on April 28,1964. Plaintiff has excepted to one of the commissioner’s findings and defendant has excepted to a number of the findings and the opinion of the trial commissioner. Briefs were filed by the parties and the case has been submitted to the court after oral argument of counsel. The court agrees with the commissioner’s findings, his opinion and his recommended conclusion of law, as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to an equitable adjustment under the Changes article of the contract, with the amount of recovery to be determined in further proceedings pursuant to Buie 47(c), with judgment reserved pending filing of a further *564 report by the commissioner, to wbom the case is remanded for the conduct of proceedings in conformity with this opinion.
OPINION OF COMMISSIONER
FINDINGS OF FACT
1» (a) For several years past, the Federal Aviation Agency (hereinafter FAA)[1] has had statutory responsibility for portions of the United States Aid Program in relation to the safety of aviation.
(b) Among the items supplied to foreign countries by FAA under the Aid Program were certain air navigational aids known as Omnirange Equipment. All such equipment material to this action was manufactured for FAA by Litton Industries, Inc.
(c) As a means of facilitating the installation and maintenance of the Omnirange Equipment, the manufacturer supplied instruction manuals to FAA, which FAA in turn forwarded to the recipient country with or in advance of the ■equipment.
(d) The first of such manuals, insofar as material to this action, was prepared by the Maryland Electronics Manufacturing Company, a subsidiary of Litton Industries, under a contract made in 1951 between Maryland Electronics and FAA.
(e) This guide, known as an Instruction Book, and hereinafter referred to as the memco manual, was prepared in accordance with the FAA specification on electronics instruction books, and contained either the actual or samples of the illustrations (photographs, drawings, and schematics) deemed necessary to illustrate and explain manuscripts initially prepared by Litton.
2. (a) In 1957, FAA entered into a contract with Litton Industries for the manufacture of additional Omnirange Equipment, which was ultimately to be shipped to foreign countries under the Aid Program.
*565 (b) Under this contract as initially made, Litton Industries was to prepare and supply the instruction manuals in final form, ready for use. Subsequently, the requirement for Litton to supply the manuals in final form was deleted, and Litton was required only to submit the instruction books in draft form, the drafts being designated as Manuscript Instruction Books.
(c) Accordingly, in the performance of its contract, Litton Industries supplied to FAA 26 manuscripts, being one for each of the 25 major pieces of equipment comprising the Omnirange System and one for the System as a whole. These manuscripts, supplied in mimeograph form, contained all necessary technical information, but no illustrations.
(d) Each of the 26 manuscripts was submitted to EAA in duplicate, and was reviewed by personnel of the FAA for technical accuracy. One copy was returned to Litton Industries for correction in accordance with the comments of the FAA personnel. The corrections were made by Litton, and the manuscripts were then returned to FAA.[2]
(e) Inasmuch as the 26 manuscripts submitted by Litton Industries were not in the format prescribed by FAA’s specification for electronics instruction books (such as the memoo manual), FAA deemed it necessary to have further work done to make the manuals conform to the specification. This work involved primarily the arrangement and editing, and perhaps some condensation of text (already reviewed for technical accuracy) and the preparation and organization of the illustrations (photographs, drawings, and schematics) required by the specification.
3. (a) When this need arose, in 1958, there were available in Washington, D.C., at least three firms which were engaged in technical writing, a professional type of work which involves the analysis, editing, arrangement, and condensation of source material (text and illustrations) in the preparation of technical books suitable for publication or, in this instance, distribution.
(b) Technical writers are invested with a considerable *566 amount of discretion with respect to what portions of the source material should be eliminated or revised and as to the composition and arrangement of the illustrative material. Depending on the nature of the request for their services, they may undertake the final production of the technical book, or they may be called upon for a skilled estimate of the extent of work involved in the production of such a book.
4. (a) During 1958 and into 1959, there existed within FAA an Omnirange Branch which was responsible for engineering analysis, preparation of specifications, and technical supervision of contracts pertaining to Omnirange Equipment. This Branch had the responsibility for reviewing the 26 manuscripts supplied to FAA by Litton Industries for technical accuracy, and also for reviewing the product later supplied by plaintiff.
(b) During 1958 and into 1959, there also existed within FAA a General Materiel Contract Branch, which had the responsibility for procurement in the sense of preparing, awarding, executing, and administering contracts, including contracts for Omnirange Equipment and for Instruction Books.
5. (a) Sometime prior to November 24, 1958, and before all 26 of the Litton manuscripts had been supplied to FAA, the ICA[3] Specialist in the Omnirange Branch prepared an estimate of the work that would be involved in changing the Litton manuscripts into Instruction Books in final form. This approximation was not based on an actual count of pages or illustrations. It was a rough estimate intended to give prospective bidders (among technical writers) some indication of the magnitude of the task. By memorandum of November 24,1958, the Omnirange Branch initiated a requisition to have the 26 Litton manuscripts placed in final form.
(b) The requisition memorandum set forth the ICA Specialist’s estimate as being 450 pages of text material, 60 pages of art work, and 50 pages of tip-in sheets.[4]
(c) Upon receipt ox the requisition in the Contract Branch, *567 in early December 1958, the Chief of the Branch[5] prepared a Request for Proposals. At this time Litton Industries had not yet furnished to FAA the last of the manuscripts.[6]
(d) In preparing the Request for Proposals, the Chief of the Contract Branch did not intend to issue it as an offer to prospective contractors. He regarded it as an invitation to prospective contractors to come in and look over what had to be done, and then to make an offer to FAA for doing the work. He expected bidders to ascertain for themselves, from their review of the available raw material, the volume of the work in terms of pages of text and illustrations.
6. (a) Early in February 1959, an electronics engineer[7] in the Omnirange Branch was instructed by his superiors to make a more accurate estimate of the illustrations that would go into the final product, which was to be a two-volume presentation of Litton’s 26 manuscripts. He reviewed the applicable specification, referred to the memco manual as a guide, counted the photographs, drawings, and schematics therein, and, in approximately 4 hours’ working time, compiled a Summary of Art.
(b) The engineer’s Summary of Art indicated that there were to be included in the two-volume Instruction Book 270 pieces of illustrative material (photographs, drawings, and schematics) divided into the following categories:
(1) Photographs to be made of memco voe equipment[8]_ 68
(2) Photographs to be made from prints in other available instruction books[9]_ 73
(3) Outline drawings to be taken from photographs in books[10]_ 33
(4) Outline drawings not available in instruction books[11]_ 22
*568 (5) Schematics and wiring diagrams to be taken from instruction books[12]- 41
(6) Schematics and wiring diagrams to be supplied as reproducible drawings to be reduced[13]- 33
Total_ 270
(c) The Summary of Art contained no indication as to how many pages would be required in the final Instruction Book to contain the 270 illustrations, since the assembly and reproduction were covered by specification CAA-R-638c.
(d) The engineer counted the pages of text in the 26 Litton manuscripts and listed a total of 811 pages.[14] In his recapitulation of the Summary of Art, he inserted the total of 811 as the number of pages of text, and added that the “approximate number of pages in final form” would be 450. This estimate was predicated on a rule-of-thumb reduction of 2-for-1 when typewritten material is printed.
-7.- (a) Material portions of the text of the Request for Proposals, as prepared by the Chief of the Contract Branch in December 1958,[15] follows:
BEQUEST FOB PROPOSALS
Your company is requested to submit a proposal, in duplicate, to the Federal Aviation Agency * * by not later than February 27,1959.
scope : It is the desire of the Federal Aviation Agency to contract for the furnishing of printed “Instruction Books” for “Omnirange Equipment” — each book to consist of two volumes of text and material, art-work and other miscellaneous data.
The Federal Aviation Agency has obtained from others “Instruction Books” describing in technical language various pieces of electronic equipment comprising what is referred to as “Omnirange Equipment.” The material has been composed and assembled into books, one book for each major component of the equipment.
*569 The contractor shall be furnished with the various books and reproducible copies of drawings, sketches and diagrams and negatives or reproducible positives of all photographic material.
The contractor shall perform all necessary labor and provide all necessary materials and equipment to technically and grammatically edit and organize all of the material furnished; re-write or re-phrase the text material; correct all drawings, sketches, etc., as deemed necessary; assemble all material for printing and have the material professionally printed and assembled into two volumes of equal size. In general, the contractor shall be required to produce an Instruction Book of the class described in CAA Specification CAA-E-638c as a Type III Instruction Book.
The contractor shall be required to produce a two volume Instruction Book comprising approximately 450 pages of text material; 60 pages of Art-work (pictures) and 50 pages of “tip-in” sheets..
The contractor shall provide 100 copies of the Two Volume Instruction Books composed as described herein.
GOVERNMENT FURNISHED MATERIAL: It ÍS anticipated that all of the material to be furnished by the Government may not be available at the commencement of the contract, but every effort shall be made to provide the contractor with all such material as quickly as possible so as not to delay the progress of the work.
The contractor shall review all of the material furnished from a technical aspect, and be responsible for the correctness of mathematical calculations and proper presentation of drawings and diagrams, as well as for orderly arrangement and proper grammatical structure of the text.
The prospective bidders may examine the material presently in possession of the Government and are encouraged to do so. It is suggested that interested parties contact the Federal Aviation Agency, * * * Mr. Marvin Amundson, who has possession of the material or Mr. J. F. Cadigan * * * to examine the material.
SPECIFICATIONS AND QUALITY OF WORK: * * *
* * * * *
The contractor shall be expected to utilize only technically qualified personnel in performance of the work under the contract. He shall be expected to provide sufficient personnel to assure complete compliance with all requirements of the contract; complete coordination with Government personnel and constant review of all *570 technical and administrative work performed to the extent required to assure complete accuracy and good commercial quality of the finished product.
‡ $
payment: Payment shall be made on a job price basis after completion of the work and services described herein, and necessary to produce one hundred (100) instruction books (two volumes) consisting of the text and illustrations furnished by the Government, and upon delivery of the books from the contractor’s plant. * * *
(b) While this document, when issued, bore the date of February 13, 1959, it had not been updated since its initial preparation in December 1958, as is evident (1) from the text of the clause relating to Government Furnished Material;[16] (2) from the inclusion of the Omnirange Branch’s original estimate of “* * * 450 pages of text material; 60 pages of Art-work (pictures) and 50 pages of ‘tip-in’ sheets”; and (3) from the absence of any reference to a “Summary of Art.”
8. (a) On or about February 24, 1959, the plaintiff,[17] Mr. Johnson, received a telephone call from the Chief of the Contract Branch of FAA (Mr. Cadigan) requesting plaintiff to come to the FAA office to discuss the writing project. When Mr. Johnson arrived, he was given a copy of the Bequest for Proposals as it appears in finding 7 (a) .[18] He had a very brief discussion with Mr. Cadigan and was then taken to the office of the electronics engineer in the Omnirange Branch (Mr. Brewer). Mr. Cadigan left, and plaintiff remained in Mr. Brewer’s office about 30 minutes.
(b) At the time of plaintiff’s visit, there had been made available to FAA, and to Mr. Brewer, all 26 of the Litton *571 manuscripts. If all of these books were in Mr. Brewer’s office at the time of plaintiff’s call, plaintiff did not so understand, and Mr. Brewer himself was uncertain of it.[19] Some of the books were there, and plaintiff thumbed through one of them as he talked with Mr. Brewer. The MEMCO manual was also available at that time.
(c) Mr. Brewer gave plaintiff a copy of his Summary of Art as it appears in finding 6(b),[20] explaining that this was his estimate of the number of photographs, drawings, and schematics that FAA would expect to be included in the final work, subject to the modification that the 22 “outline drawings not available in instruction books” would be eliminated, thereby reducing the total number from 270 to 248. He made no representation to plaintiff with respect to the number of pages that would be required to insert the 248 illustrations in the final Instruction Book. He did express the opinion that his estimate of illustrative material was more realistic than the estimate contained in the Bequest for Proposals.
(d) On the next day, a technical consultant in plaintiff’s office (Mr. Zabriski) called on Mr. Brewer and remained with him for approximately 45 minutes, discussing the work to be done. Upon leaving, Mr. Zabriski took with him for further study one of the 26 Litton manuscripts and the memco manual.
9. (a) Mr. Johnson consulted with Mr: Zabriski and with other aides and technicians in his office,, and then personally supervised the preparation of his response to the Bequest for Proposals. He had had more than 30 years of experience in preparing estimates and submitting bids for this type of work.
(b) In the preparation of his bid, plaintiff was aware of and took into account the fact that the Bequest for Proposals came from the Contract Branch of FAA, while the Summary of Art came from the Omnirange Branch. He did not construe the Summary of Art as an amendment or modification of the Bequest for Proposals, but considered *572 it to be an enumeration of the source material from which the Instruction Book was to be prepared.
(c) From the text of the Bequest for Proposals and from his conversations with Messrs. Cadigan and Brewer, plaintiff gained the impression, which remained with him until long after the contract was made, that the full set of 26 Litton manuscripts was not available for his examination in the preparation of his bid. He drew a distinction in his own mind between preparing a bid in reliance on the estimates contained in the Bequest for Proposals, and the work that would be involved in making his own careful and exhaustive study of the source material as the basis of his bid, and concluded that FAA intended for him to rely on the estimates in the Bequest for Proposals, particularly in view of the fact (as he understood) that all of the source material was not available.
(d) Plaintiff considered the estimates contained in the Bequest for Proposals to be realistic, in terms of his limited knowledge of the project. The specification of 811 pages of text in the manuscripts reflected a reasonable base for the estimate of 450 pages in the final book, since printing normally reduced double-spaced typewritten material on a ratio of 2-to-l. The estimate of 60 pages of art and 50 pages of tip-in drawings (schematics) reflected a total of 110 pages of illustrative material, which was in accord with the normal ratio of 1 page of illustration to 4 pages of text.
(e) Plaintiff was aware of some discrepancy between the Summary of Art and the estimates in the Bequest for Proposals but, considering the Summary of Art as an enumeration of source material in terms of pieces (pictures or diagrams) rather than pages, he reconciled the two on the thesis that 248 illustrations could be compressed into 110 pages, or something near that number.
10. (a) On the basis outlined in the preceding finding, plaintiff prepared his response to the Bequest for Proposals and forwarded it to FAA under date of March 6,1959. Pertinent portions of the response follow:
In accordance with your invitation * * * and meetings of our representatives with Mr. Cadigan of the contract branch and Mr. Brewer of the technical branch *573 concerned, we hereby submit a proposal for furnishing of printed “Instruction Books” for “Omnirange Equipment.” These books will consist of two (2) volumes of test material, art work and other miscellaneous data according to specifications called out in subject invitation and instruction received from appropriate technicians.
(1) Thorough study and evaluation of material contained in the invitation and sample instruction books prepared by Litton Industries, coupled with information on text and art requirements given us by Mr. Brewer, plus our experience and knowledge factors have formed the basis for our proposal.
a. Qualifications: * * * Due to the broad fields of engineering covered by our staff personnel and associates and the breadth of technical manual material now being produced in our facilities, we feel particularly qualified toward accomplishment of the work anticipated.
b. Estimates Cost estimates have been realistically developed from present projects and in light of present economic evaluation.
* * * * *
e. Facilities. We maintain active facilities for engineering, drafting, writing, and editing; air brush, photocopy, and photo lab work; as well as their supporting clerical services and library. * * *
(2) LEADERSHIP Mr. Johnson will actively participate in the project in an administrative and supervisory capacity. He has a long record of researching, writing, and editing manuals for the Army, Air Force, and Marine Corps. Our writers and editors will be checked by qualified electronics specialists associated with this firm in all phases of the work. * * *
(3)- procedures
a. It is proposed that the work be developed in the following phases and that close liaison with the reviewing military authority be maintained to expedite this accomplishment.
1. Phase I will comprise reformat, editing, and updating of existing material and preparation of a review manuscript.
2. Phase II will comprise incorporation of corrections and changes indicated by the Federal Aviation Agency technicians in review comments from Phase I, plus final typing, proofing, and printing of final copy in pre-print-ing sample.
8. Phase III shall comprise final printing of 100 copies in two (2) volumes and shipment, FOB Washington, to the address indicated by the Federal Aviation Agency.
*574 b. This proposal is based on the following considerations.
1. Art and scematics [sic] will be prepared in categories as outlined in “Summary, of Art” furnished by Mr. Brewer.
2. All data, reference material and pertinent engineering information will be furnished by the Federal Aviation Agency.
8. A set of sample equipment will be made available to our office for observation, study, and photography where necessary.
* * * * *
(5)PRICE, PAYMENT, AND TIME
a. Price. The price for the job as outlined in the invitation and in this proposal is $9,650.00, or $16,078.90, depending on printing alternate from paragraph (6).
* * * * *
(6) PRINTING
a. #1 Alternate includes IBM composition, single column, unjustified 10/12 which makes job price total $9,650.00, including 200 specified “Multi-ring” binding of $7.35 cost each.
b. #2 Alternate includes Justowriter composition, 2 column, 10/12, justified right and left for $16,078.90. Specified “Multi-ring” binders are included at $7.35 each.
(7) CONCLUSION
Considering all facts in connection with subject project, this organization is prepared to produce editing services which will meet or surpass all requirements of the Federal Aviation Agency. Our writers and editors will work closely and willingly with their appropriate counterparts in the Federal Aviation Agency and will produce work which will be a source of credit to the Federal Aviation Agency and our firm.
(b) By letter dated March 11,1959, plaintiff submitted an amendment to the foregoing proposal whereby the price of $9,650 under the #1 Alternate was increased by $175 to a total of $9,825. FAA accepted the amendment in return for plaintiff’s undertaking to provide a format of two columns per page in lieu of one column per page.
11. (a) The Request for Proposals was submitted to two other companies: John I. Thompson & Company, and Consultants & Designers, Inc. Both companies sent representa *575 tives to confer with FAA officials; the representatives were directed to the office of Mr.'Brewer, where they were given copies of his Summary of Art and advised that (art) estimates in the Request for Proposals were not as accurate as the Summary of Art. They were also apprised of the elimination of the 22 outline drawings.
(b) John I. Thompson & Companyj by letter dated March 9,1959, proposed to “produce the 100 copies (2 volumes each) of the Type III instruction book material specified by the * * * invitation for total sum of $28,032.” This proposal was predicated on printing, as required by the applicable specification.
(c) Consultants & Designers, Inc., by letter of March 9, 1959, proposed to “furnish printed ‘Instruction Books’ for ‘Omnirange-Equipment’ in accordance with subject Invitation * * * at a total price of $18,895.14.” Three days later, by letter of March 12, 1959, “in reference to your [FAA’s] request,” this firm proposed to “furnish printed instruction books subject invitation typed as indicated on the enclosed sample at a reduction in cost of $3,100.00,” thereby reducing “the total price from $18,895.14 to $15,795.14.” The typed sample was done in small type, single-spaced, with one column to the page, right margin unjustified.
12. (a) On March 30, 1959, Mr. Cadigan, for FAA, forwarded to plaintiff “four * * * copies of proposed Contract FA-94 for services to be performed relative to development of Instruction Books for Omnirange Equipment,” and requested plaintiff to “execute and return three * * * copies immediately,” saying “a signed copy will be returned to you and you will be directed to proceed with the work as outlined therein.”
(b) Plaintiff signed and returned the copies accordingly, and a copy signed by Mr. Cadigan for FAA bearing date of April 3,1959, was returned to plaintiff.[21] Meanwhile, plain *576 tiff received from Mr. Cadigan telegraphic “notice of award of Contract FA-94 * * * for lump sum price $9,825.-00 * * *” with instructions to contact Mr. Brewer immediately and commence work, since “this is your notice to proceed effective April 3.”
13. (a) Following are excerpts from the first five pages of Contract FA-94. These five pages were prepared by FAA for the express purpose of setting forth the agreement between it and plaintiff. The signatures of the parties were affixed at the end of this text, immediately following the clause incorporating “applicable conditions of General Provisions * * * Standard Form 32 * * *,” to which reference is made in paragraphs (b) and (c) of this finding.
* * * * *
whereas, the Government requires the services outlined herein and sufficient Government employees are not now presently available and will not become available to perform these services, and.
whereas, it has been determined to be necessary to obtain the required services by contract from an outside source;
now therefore, the parties do mutually agree as follows:
ARTICLE I: SCOPE
The Federal Aviation Agency has obtained from others “Instruction Books” describing in technical language various pieces of electronic equipment comprising what is referred to as “Omnirange Equipment.” The material has been composed and assembled into books, one book for each major component of the equipment.
The contractor shall be furnished with the various books and copies of drawings, sketches and diagrams and positives of all photographic material.
The contractor shall perform all necessary labor and provide all necessary materials and equipment to technically and grammatically edit and organize all of the material furnished; re-write or re-phrase the text material; correct all drawings, sketches, etc., as deemed necessary; assemble all material for printing and have the material professionally printed and assembled into two volumes of equal size. In general,, the contractor shall be required to produce an Instruction Book of the class described in CAA Specification CAA-B-638c as a Type III Instruction Book, except that the completed text material shall be produced for printing by using an *577 IBM-PSM Machine to form 2-column unjustified copy for direct reproduction by the printer. . The contractor shall be required to produce a two volume Instruction Book comprising approximately 450 pages of text material, in addition to Art-work (pictures), and “tip-in” sheets.
* * * * *
The contractor shall provide 100 copies of the Two Volume Instruction Books composed as described herein.
* * * * *
AimCLE VI: PAYMENT
The Contractor shall be compensated for all work performed at the lump sum price of $9825.00.
Upon satisfactory completion of Phase I and Phase II, the contractor will be eligible for payment of 50% of the contract price and payment shall be made upon receipt by the Government of a properly prepared invoice.
Payment of the balance of the contract price shall be made upon satisfactory completion of Phase III of the contract and upon receipt by the Government of a properly prepared invoice.
ARTICLE vn: GOVERNMENT FURNISHED MATERIALS
For estimating purposes and to permit the contractor to schedule his work, the Government shall provide a “Summary of Art Work” it anticipates will be required to be performed by the contractor. This will include an estimate of the Art and Schematics and the categories of each that will be required.
All data about the equipment, reference material and pertinent engineering information will be furnished by the Government.
As necessary for photography purposes and to permit the contractor to observe and study the equipment, a set of sample Omni-Range Equipment will be made available by and at the expense of the Government.
The contractor shall review all of the material furnished from a technical aspect, and be responsible for the correctness of mathematical calculations and proper presentation of drawings and diagrams, as well as for orderly arrangement and proper grammatical structure of the text.
* * * * *
ARTICLE x: INTERPRETATION OR MODIFICATION
No oral statement of any person, and no written statement of anyone other than the Contracting Statement *578 [sic], shall be allowed to modify or otherwise affect the terms or meaning of this contract. Requests for interpretations, modifications, or changes must be made in writing to the Contracting Officer.
ARTICLE XI: GENERAL PROVISIONS
Applicable conditions of General Provisions (Supply Contract) Standard Form 32, Oct. 1957 Edition, are made a part hereof.
$ $ ‡ $
(b) Following is the text of the “Changes” article in the General Provisions of Contract FA-94:
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor’s claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
(c) Following is the text of the article on “Disputes” in the General Provisions of Contract FA-94:
(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this *579 contract which, is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 80 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Con--tracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
(h) This “Disputes” clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, That nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.
14. (a) The 26 Litton manuscripts and the memco manual were delivered to plaintiff by FAA on April 2,1959, and work was begun on or before April 3.
(b) As the work progressed, plaintiff submitted draft, copies of the various sections of the Instruction Book to FAA for review. The draft copies contained the text as it would appear in the final manual and also contained either rough photographs or indications of the space to be occupied by particular photographs, drawings, or schematics. The format and compositions of the text and the illustrations were set up by plaintiff in the manner deemed by him to be technically feasible, his judgment being guided by the applicable specification. FAA gave plaintiff no instructions concerning the layout prior to the submission of the draft copy, nor was plaintiff ever required by FAA to change layouts as submitted *580 in draft form. There is no issue here of changed requirements resulting from FAA’s review of plaintiff’s work.
(c) Neither is there any issue here as to timely completion of the work. Plaintiff performed the contract, and delivered to FAA the 100 sets of the two-volume Instruction Books, which FAA accepted. Plaintiff has been paid the contract price of $9,825, plus an additional amount initially allowed by the contracting officer which is in controversy as hereinafter recited.
15. (a) In the final Instruction Book as prepared by plaintiff, there were 196 pages of illustrations containing 308 items (photographs, drawings, and schematics) and 898 pages of text.[22]
(b) Within 3 months after plaintiff began work on the contract, he became concerned over what he considered to be an overrun of material in the end product, and brought the matter to the attention of FAA. On August 7,1959, plaintiff wrote to FAA (Attention: Mr. Cadigan) as follows:
In accordance with our meeting yesterday and in continuance of our letters of July 10 and 17 and August 3 we herein summarize the total text, art and tip-ins sheet *581 count required to complete the two volume manual specified in contract FA 94.
Total test pages 858
Contract stipulation 450
Excess requirement 408
Total illustration pages 172
Contract stipulation 60
Excess requirement 112
Combination art & text paging 20
Total tip-in sheet 60
Contract stipulation 50
Excess requirement 10
The above record of material in final preparation to complete this contract substantiates our previous estimate (letter July 17) and reflects the fact that all of our technical and other services and printing have increased proportionately.
This job has been prepared to meet the appropriate specifications and special requirements of the contract, type facing, sizes and other reproduction factors included. Sample text and art pages were submitted and approved by the FAA technicians directly concerned before the final plates were produced.
It is apparent from the art increase of nearly three times the original paging given in the IFB and contract that the paging increase of nearly two times could be expected.
It is pointed out that this contractor did not make the original estimates nor did he observe the entire lot of source material and therefore was dependent on the estimate of others. The physical preparation of the material actually proved these estimates to be substantially less than final copy indicates.
We are attaching a billing revising that of July 17 for the extra work involved. We will appreciate an early amendment to the contract covering the extra work since we plan to deliver the final manual in about two weeks.
*****
(c) The revised billing submitted with the foregoing letter was as follows:
408 pages @ 6.41 2615.28
112 pages art @ 64.98 7277.76
20 combination art and text pages @ 35.69 713. ¿0
10 tip-in sheets @ 38.10 381. 00
Total 10987. 84
*582 (d) On August 21, 1959, plaintiff again wrote to Mr. Cadigan:
Two weeks ago today I told you that unless positive steps were taken regarding the excessive over-run of material and extra work in connection with contract FA 94, clarifying our position and providing for our compensation, we would not be able to continue work on the project.
You agreed then (Aug. 6, 1959) to a partial payment of 40% payment of the basic contract price. On. Aug. 7, 1959 we provided you with information on which to justify such a payment. On Aug. 14 you advised me that a check would be issued on the 18th or 19th of August.
On Aug. 18 I received a phone call from your office setting up a meeting regarding the existing situation.
The purpose of this meeting appeared to be to justify the large difference between the number of pages, art and fold-ins given in the IFB and those which actually proved tobe required to complete the work.
We are strongly of the opinion that this is a matter of internal interest to FAA and not concerned with our contractual relationship. We bid on the job as advertised and expect reimbursement for work performed thereunder as well as the extras and changes which you requested and are imperative to the complete presentation.
As this meeting concluded there was no concrete evidence that our payment requested over a month ago was forthcoming at any specific time.
Due to the fact that we already have delivered more material than is provided for in contract FA 94 and that commitments for partial payment have now been postponed twice and no amendment has been issued to even generally cover the existing situation in regard to the excessive over-run in text, art fold-ins and combination text-art pages we do not feel that we can continue work until some equitable measure is provided under which we can securely operate.
Up to now, in good faith, we have continued work on the project, but our own commitments based on unfulfilled ones from FAA have placed us in a completely untenable position.
The billing attached reflects a moderate correction in pricing determined from a recheck of our original cost figures. We will analyse the art considerations to be sure no duplication of charges exists. The text count *583 we believe to be very close and the art and tip-in counts to be accurate.
If FAA' will issue an amendment to this. contract covering the deficienciés stated in our letter and billings of July 10 and 17 and August 7 and 21 and will make payment by 24 August 1959' of either 40% of the basic contract or for our enclosed billing of % of the extra work completed to date we will proceed to the completion and delivery of the technical presentation under discussion. Otherwise we will not be in a position to continue work at this time.
(e) The revised billing submitted with the foregoing letter was as follows:
For furnishing at least 50 percent of all necessary labor and providing all necessary materials and equipment to technically and grammatically edit and organize the material furnished, and all other services provided by the contract for extra work accomplished to date on contract no. FA 94.
408 text pages @ 6.53 $2,664.24
112 Art pages @ 64.59 7,234. 08
20 combination pages @ 35.56 711.20
10 tip-in sheets @ 36.50 365.00
§10,974.52
This billing: 50% §5[ 487.26
Revision of billing of 17 July and August 7,1959
16. (a) On August 21, 1959, Mr. Cadigan wrote to plaintiff:
Confirming discussion had with Mr. Johnson on Thursday, August 20, there exists a dispute relative to a change in the scope of Contract No. FA-94 and with respect to the additional compensation you feel is due you because of such change in the scope of the work.
We are in receipt of your letter of August 21, relative to your inability to continue with performance under the'contract unless payment is received by you on August 24,1959. _ .
_ As agreed during the hearing on your claim for additional compensation, the Government does recognize that the work performed'by you under the contract has exceeded to a certain extent that contemplated at the time the contract was awarded to you. The Government does not' agree however, that your request for an additional payment of $10,974.52 is an equitable adjustment in the contract price for such additional work.
*584 As verbally requested of you on August 21, you must substantiate your claim for additional compensation, especially with respect to the “additional 112 Art Pages” claimed by you in your billings.
Your attention is invited to Clauses 2 and 12 of the General Provisions of the contract (Standard Form 32) wherein it is clearly established that it is your responsibility to continue with the contract work until such time as an equitable adjustment in the contract price is decided upon.
We are processing a modification to the contract to confirm the fact that the progress of the work to date indicates that the scope of the contract has changed with regard to the amount of work to be performed by you, and to permit a partial payment up to 90% of the original contract price. It is not at all possible that payment will be received by you on August 24. We shall do all possible to expedite payment to you.
With respect to your claim for additional compensation, it will be necessary for you to clearly establish that the amount of art work performed by you is, in fact, an increase over that contemplated at the time the contract was entered into, and if that can be established, it will likewise be necessary for you to justify your increased costs because of such increase in work.
At the time the request for proposals was issued, the Government indicated that there would be approximately 450 pages of text material; 60 pages of art work (pictures) and 50 tip in sheets. During your examination of the material, you were furnished with a “Suihmary of Art” work required in connection with the printing of the instruction books, which summary included an estimate of the art and schematics and the categories of each that would be made part of the books. In preparing your estimate of the work to be performed and quoting your price therefor, you stated:
“This proposal is based on the following considerations :
“1. Art and schematics will be prepared in categories as outlined in ‘Summary of Art’ furnished by Mr. Brewer.”
The contract, based on your proposal, was prepared with recognition of the “Summary of Art” and you countersigned the agreement.
It will be necessary, therefore, for you to establish to what extent the work actually performed by you has differed from that outlined in the “Summary of Art,” on which you based your price quotation.
*585 As stated in our discussion with, you on August 20, we shall be pleased to give you the opportunity to present your views in a personal hearing in our office at your convenience.
(b) Clauses 2 and 12 of the General Provisions of the contract, to which reference was made in the fifth paragraph of the foregoing letter, are the articles on Changes and Disputes, set forth in finding 13 (b) and (c).
(c) On August 27, 1959, FAA[23] transmitted to plaintiff three copies of Modification No. 1 to Contract FA-94, with the request that plaintiff execute two copies and return them to FAA.
(d) Following is the text of Modification No. 1 to Contract FA-94:
This Contract is hereby modified as follows:
Delete the words “450 pages of text material,” which appears in the last sentence on Page 1 under Article I, entitled “Scope,” and insert the following in lieu thereof :
“858 pages of text material”
The second and third paragraphs under Article VI, entitled “Payment” are hereby deleted in their entirety and the following inserted in lieu thereof:
Upon satisfactory completion of Phase II, the Contractor will be eligible for payment of 50% of the Contract price and payment shall be made upon receipt by the Government of a properly prepared invoice.
Upon satisfactory completion of Phase II, the Contractor will be eligible for payment of 40% of the Contract price and payment shall be made upon receipt by the Government of a properly prepared invoice.
Payment of the balance (10%) of the Contract shall be made upon satisfactory completion of Phase III of the Contract and upon receipt by the Government of a properly prepared invoice.
Any claim by the Contractor for an adjustment in price, for the changes specified under Article I, must be *586 asserted within 30 days from the date of receipt by the Contractor of this modification.
Except as modified by the foregoing, all other terms and conditions of the Contract remain unchanged.
(e) On August 28, 1959, plaintiff signed the Modification under a line reading:
The contractor hereby accepts this Modification and agrees to the terms and conditions contained therein.
17. (a) On September 24, 1959, plaintiff submitted to ,EAA (through Mr. Cadigan) his formal claim for an adjustment in price, as follows:
We hereby make formal claim for an adjustment in price of Contract FA 94 * * * due to increase in text pages from 450 to 858; art pages from 60 to 198; and tip-in sheets from 50 to 63.
We have carefully analyzed the “Summary of Art” mentioned in your letter of August 21, 1959, and made adjustments in pricing the extras accordingly. We have further analyzed and established reimbursable costs for the extras caused by incorrect statements of text, art and tip-in pages given in the invitation to bid and further complicated by the “Summary of Art” which we logically, assumed was a list for elimination or composite into the 110 pages of art and tip-ins.
This has been an expensive and difficult estimate to establish since it is not possible to exactly separate the original contract coverage from the “new and/or extra work involved.” We believe this to be a fair and equitable evaluation of the project as it now stands.
Since Phase II of tne work is now completed and approximately 80% of the work is completed in Phase III, we request payment in accordance with Modification I of 50% for Phase I and 40% for Phase II for the below listed extras at this time.
In considering this claim, please bear in mind that:
a) The text increased 91%.
b) The art increased 225 %.
c) The tip-ins increased 38%%.
d) The basic art increased 23.3%.
We are also enclosing a final corrected billing prorated from our own original estimate (as was done in our billing of August 7, 1959), but with a credit for overlap in art charges. We are willing to accept either *587 method of payment provided immediate, action is taken to settle this claim.
(b) Enclosures forwarded with the foregoing letter consisted of cost breakdowns for (1) text prepared and reproduced, $12.49 per page; (2) art reproduced, $25.13 per page; (3) tip-in sheets reproduced, $39.24 per page; and (4). art preparation, $32.77 per page; plus a fifth enclosure-giving an analysis of the art work in terms of the Summary of Art, as follows:

18. (a) On November 9, 1959, FAA’s Chief, General Materiel Contract Administration Unit,[24] wrote to plaintiff as follows:
Your claim for increased compensation under Contract FA-94 for work accomplished beyond the scope of work presently stipulated has been reviewed by this office.
This constitutes findings of fact and the decision called for under Clause 12 of the General Provisions of the Contract entitled “Disputes.” Your attention is invited to that clause and to the finality of the decision in the absence of the exercise on your part of the rights to appeal.
Request for Proposals * * * was let on February 18, 1959 and stipulated, in part, under Scope: The Contractor shall be required to produce a two volume Instruction Book comprising approximately 450 pages of text material; 60 pages of Art-Work (pictures) and 50 pages of “tip-in” sheets. Under Government Furnished Material, it was stated that: “The Contractor shall review all of the material furnished from a technical aspect, and be responsible for the correctness of mathematical *588 calculations and proper presentation of drawings and diagrams, as well as for orderly arrangement and proper grammatical structure of the test [sic]. The prospective bidders may examine the material presently in possession of the Government and are encouraged to do so.”.
During your subsequent examination of the material, you were furnished with a “Summary of Art” work required in connection with the printing of the instruction books, which summary included an estimate of the Art and Schematics and the categories of each that would be made part of the books. In preparing your estimate of the work to be performed and quoting your price therefor, you stated:
“This proposal is based on the following considerations :
“1. Art and Schematics will be prepared in categories as outlined in ‘Summary of Art’ furnished by Mr. Brewer.”
Contract FA-94, based on your proposal, was prepared with recognition of the “Summary of Art” and you countersigned the agreement.
Under Article I, entitled scope of this Contract, it states that “the Contractor shall be required to produce a two volume Instruction Book comprising approximately 450 pages of test [sic] material, in addition to Art-Work (pictures) and ‘tip-in’ sheets.”
Based on the above facts, the Government hereby recognizes that you did in fact render services over and above that called for within the scope of work under this Contract. By Modification No. 1, the pages of text material was increased from 450 to 858 and the Contractor was given a right to make a claim for an adjustment in price, which has been done and is part of this claim herein decided. Therefore, it has been determined that the additional compensation to be reimbursed you is as follows:
408 text pages @ $6.53 $2, 664. 24
40 Art Pages @ $64.59 2, 583. 60
20 Combination Pages @ $35.56 711. 20
$5,959.04
No reimbursement will be made for an excess of 17 photographs made from prints in the Instruction Books (Item 2, Summary of Art) as the total count of the reproduced Instruction Books shows a decrease of 13 photos of memco vor eqpt., 19 outline drawings, and 11 tip-ins (Schematics) compared to the estimated amounts *589 shown in the Summary of Art. It is hereby determined that the decrease in cost for these items offsets the cost of the extra 17 photographs.
Upon receipt of a properly certified invoice, we will request our Accounting Department to effect payment in accordance with the payment provisions of the Contract.
(b) In preparing the foregoing letter, the contracting officer derived (1) the excess number of pages of text from contract Modification No. 1; (2) the excess number of pages of art and combination work from plaintiff’s reconciliation of the Summary of Art, as set forth in Enclosure B[25] of plaintiff’s letter of September 24,1959;[26] and (3) the prices per page, for both text and art, from plaintiff’s billing of August 21,1959.[27]
(c) The amount of $5,959.04, as found by the contracting officer, was duly paid to plaintiff, making the total payment to him $15,784.04 ($5,959.04 for extras plus the contract price of $9,825.00).
,19. (a) Plaintiff noted an appeal to the head of the Agency from the contracting officer’s decision. At this time the appeals procedure of FAA had not been formally codified in the Federal Register. When codification occurred,[28] it provided that “these procedural rules merely codify and formalize the procedures presently followed by the Agency in handling its contract appeals.”
(b) Plaintiff does not now contend that the appeals procedure followed by FAA prior to the codification did not substantially conform to the procedure as subsequently codified. He does contend (1) that he did not receive a full and fair hearing of his claim; (2) that the final decision issued by the FAA Administrator was not actually his decision and that it was not issued by the Administrator as a result of any full consideration of plaintiff’s position; and (3) that *590 the Administrator did not, in fact, consider plaintiff’s claim.[29]
(c) The contracting officer forwarded plaintiff’s appeal to the Chairman of the Contract Appeals Panel of FAA, by whom it was referred to Mr. ft. H. Tyler, a member of the Panel, and plaintiff was so advised.
(d) On January 11,1960, in a letter addressed to Mr. Tyler, plaintiff’s attorney summarized the claim as follows:
* * * * *
The Agency’s Request for Proposals, * * * Contractor’s proposal * * * and the contract itself provided for the production, including writing and furnishing 100 copies, of a two volume instruction book on “omnirange equipment” comprising approximately 450 pages of text material, requiring reformating and rewriting services, plus 60 pages of art work, and 50 pages of tip in sheets. The original lump sum price was $9,825.00.
The work under contract was expanded to a degree that finally it was necessary to produce paging in excess of the above as follows: 448 excess pages of text, 136 excess pages of art, 13 excess tip in pages.
This development was called to the attention of the Agency from time to time by letters of the Contractor and adjustments were requested.
Modification No. 1 of August 28, 1959 to the contract increased the text paging to 858 and provided the Contractor could make claim for price adjustments within 30 days thereof.
On September 24, 1959, Contractor requested an adjustment for an increase to 858 pages of text, 193 pages of art, and 63 tip in sheets. On November 11, 1959 this was increased to 898 pages of text, 196 pages of art, and 63 tip in sheets..
A partial adjustment was allowed by the decision of November 9,1959 by the Contracting officer and this appeal followed.
This expansion of the work has greatly increased contractor’s cost of performance at every stage and actually more than doubled the work as originally estimated.
*591 Contractor requests an increase in the contract price for changes and extras in the sum of $8,252.33 computed as follows:
448 pages of text @ $6.63 $2, 925.44
136 pages of art @ $64.98 8, 837.28
13 tip in pages @ $36.50 474.70
total : $12,237.42
Supervision 10% 1,223.74
$13,461.16
Less allowance 11/9/59 5,959.04
$7, 502.12
Est. Attorney’s fee for appeal 10% 750.21
total: $8,252.33
The above unit prices are predicated on the full allowance of all three categories of items due to the interrelationship between technical and art labor in accomplishing the work, as well as the method of original estimate on which these sums are based.
(e) Attached to the foregoing letter was an affidavit executed by plaintiff containing a “Summary of Facts” wherein plaintiff asserted that—
In connection with the summation submitted with counsel’s letter of January 11, 1960, there is an error in the unit figure on the art-work and therefore the present, final claim has been recomputed at the end of this statement * * *.
The recomputation substituted as the price per page of art the figure $64.59 for the figure $64.98, resulting in a reduction of the total claim from $8,252.33 to $8,187.92.
(f) On January 25,1960, a hearing was held before Panel Member Tyler. The hearing took the form of a conference, at which plaintiff was afforded opportunity to present his claim. No evidence was submitted on behalf of FAA at that time.
20. (a) Panel Member Tyler prepared a memorandum reviewing plaintiff’s claim and giving his conclusions concerning it.[30] This memorandum was somehow routed to the *592 Office of the General Counsel, where a Deputy General Counsel of FA A took charge of it and, with the aid of other lawyers, prepared his own draft[31] of a decision for submission to the Administrator.
(b) On July 25,1960, the Administrator signed and issued his Decision on Appeal,[32] the full text of which follows:
INTR0DUCTI0N
This is an appeal under Contract No. FA-94 by Edward T. Johnson and Associates, hereinafter referred to as the Contractor, from a decision of the Contracting Officer dated November 9,1959, awarding the Contractor additional compensation in the sum of $5,959.04. The Contractor claims he is due an additional sum of $7,443.36 plus $744.36 for attorney’s fees.
An appeal of this nature by a contractor wherein a hearing is granted by the Administrator is a de novo proceeding. The Administrator is empowered under Article 12, entitled “Disputes,” General Provisions, Standard Form 32, to consider the entire matter anew. Utility Trailer Sales Company of San Francisco, ASBCA No. 4689, 58-2 BCA, Par. 1948, decided September 10, 1958, supports the conclusion that an appeal under the Disputes clause, taken from the Contracting Officer’s decision, is regarded as a hearing de novo. In that case the Navy Board said, “It seems to be well settled that trials on appeal to this Board are de novo.” It cited Jarcho Brothers, Inc., NBCA No. 124, September 28, 1945, in which the Navy Board of Contract Appeals quoted from Fox Sport Emblem Corporation, 1 CCF, 57, as follows:
“The Board (Army) is of the opinion that the taking of this appeal, which confers jurisdiction on the Board to consider the case, opens up the entire case and the Board may consider any error that may come to its notice. This the Board may do quite aside from the question of whether or not the error considered has been questioned by the appellant on its appeal.”
* * * * *
*593 SUMMARY OF FACTS
Invitation No. 9-346681 of February 13, 195.9, was sent to Edward T. Johnson and Associates, Consultants and .Designers, Inc., and John I. Thompson and Company, requesting their lump sum proposals on providing the Federal Aviation Agency with all necessary labor, materials and equipment to technically and grammatically edit and organize all material furnished to the successful bidder into a two-volume set of one hundred instruction books on VHF Omnirange equipment. Additionally, the successful bidder was required to rewrite or rephrase the text material,, correct all drawings, sketches, etc., as deemed necessary, and to assemble all material for printing and to have it professionally printed in the aforesaid two volumes. The invitation required the successful bidder to review all of the material furnished from a technical aspect. Prospective bidders were informed that they “may examine the material presently in possession of the Government and are encouraged to do so.” The names, with telephone numbers of two FAA employees were given as the persons to contact for appointments to examine the materials. The invitation to submit proposals included further information on the instruction books to be produced as “comprising approximately 450 pages of text material; 60 pages of Art-work (pictures) and 50 pages of 'tip-in’ sheets.”
All three of the aforementioned companies were afforded full opportunity to examine the materials which were to comprise the two-volume books. They were also given access to twenty-six booklets by Maryland Electronic Manufacturing Corporation showing pictures of equipment to be included in the VHF Omnirange books. Two bidders made rather extensive use of the materials available to all bidders and conversed with FAA employees who knew the subject matter before submitting bids. Edward T. Johnson and Associates had the same opportunity as other bidders to examine materials and confer with FAA employees. Mr. Johnson personally made a cursory examination of some materials and admitted to the hearing officer that he only examined one or two of the twenty-six booklets of memco. Subsequently Mr. Owen, a technician employed by Edward T. Johnson and Associates, spent some time in FAA offices going over the materials among which were the memco books containing pictures of the equipment to be included in the VHF Omnirange book. It has been stated by FAA employees to the Contract Appeals Panel Member who held the hearing on this matter that Mr. Owen of *594 Edward T. Johnson and Associates was fully advised by them on all aspects of the work, including FAA estimates of the number of text pages the raw material would reduce to, and that the FAA estimates set out in the invitation were nothing more than estimates and were not accurate. Even though all three prospective bidders were given equal opportunity for acquainting themselves with the scope of the proposed contract, Edward T. Johnson and Associates spent substantially less time in doing so than did the others. The bids submitted were as follows:
Edward T. Johnson and Associates-$9,825.00
Consultants and Designers, Inc- 15,795.14
John I. Thompson and Company- 23, 032.00
A lump sum contract dated April 3,1959, was negotiated with Edward T. Johnson and Associates in the sum of $9,825.00. The contract read in part as follows:_
“The contractor shall be furnished with the various books and copies of drawings, sketches and diagrams and positives of all photographic material.
“The contractor shall perform all necessary labor and provide all necessary materials and equipment to technically and grammatically edit and organize all of the material furnished (underscoring supplied) ; rewrite or rephrase the text material; correct all drawings, sketches, etc., as deemed necessary; assemble all material for printing and have the material professionally printed and assembled into two volumes of equal size. * * * The contractor shall be required to produce a two volume Instruction Book comprising approximately 450 pages of text material, in addition to Art-work- (pictures) , and ‘tip-in’ sheets.”
The contract was modified by the Contracting Officer effective August 28, 1959, to increase the number of pages of text to be produced from 450 to 858. The modification provided that any claim for an adjustment in price had to be asserted within 30 days after receipt of the notice of modification, and this was done. The Contracting Officer allowed additional compensation for the cost of the production of additional pages of text material, additional pages of art work, and additional pages of combined text and art work.
The Contractor claims that he should be paid compensation additional to the negotiated lump sum contract price as modified, for work accomplished in excess of that contemplated by both parties to the contract. The Contracting Officer decided that the Contractor should be *595 paid $5,959.04 additional compensation. The Contraetor claims that he should be paid $7,443.56 more than the Contracting Officer allowed, plus an additional sum of $744.36 for Attorney’s fees. From the decision of the Contracting Officer, the Contractor filed a timely appeal and a hearing was held in due course.
CONCLUSIONS
The Contractor advances two grounds upon which additional compensation should be paid to him.
First, the Contractor claims that he was not placed on notice by the Government that overruns might occur. The raw materials which were to comprise the two-volume set of books were estimated by the Government to reduce to approximately 450 pages of text material. The estimate on the part of the Government was not a warranty that the raw materials would reduce to 450 pages of text material. By the terms of the contract itself, the Contractor was required to rewrite or rephrase the text material and there was no way for the Government to ascertain in advance the precise number of final text pages that the Contractor would rewrite. The Contractor himself should have been in a better position to know that. Although the invitation to submit proposals stated that all of the raw materials “may not be available at the commencement of the contract,” they were in fact available not only before the contract was executed but before the proposal of the Contractor was prepared. It is elementary that responsibility for fixing his price rests upon the Contractor.
Second, the Contractor claims that an ambiguity exists and that such ambiguity was caused by the Government.
The rule applicable to this case is stated in 22 Comp. Gen. 583,586, as follows:
“* * * it is well established that in determining the intention of the parties with respect to the terms of a written contract, the question is not what intention may have existed in the minds of the parties but what intention is expressed by the language used in the contract.”
“A contract having been reduced to writing and signed by the contracting parties, the liability of each party must be measured thereby.” The New Jersey Foundry and Machine Co. v. United States, 44 Ct. Cl. 178 (1909).
By the terms of the contract the Contractor became obligated to the Government to “perform all necessary labor and provide all necessary materials and equipment *596 to technically and grammatically edit and organize all of the material furnished.” (Underscoring supplied.) All of the material which was to comprise the two-volume set of books was available to the Contractor before the contract was executed.
The Government contracted for 100 two-volume sets of books. It furnished all of the materials which were to comprise the books. It was the responsibility of the Contractor to rewrite or rephrase the text materials and reduce it to approximately 450 pages. The Contractor now claims that the reduction did not approximate the Government’s estimate of 450 pages of text material. However, the actual reduction is acceptable to the Federal Aviation Agency. The Contractor has not been misled by the Government, nor has the Government performed any act which could be construed as fraud or duress. Indeed, if the Contractor has labored under any misconception, it is of his own making.
The ability of a contracting agency of the Government to agree to pay more than a previously agreed contract price, is limited by well-defined and longstanding principles of law. However, this contract was formally modified by the Government at a date prior to its completion. The modification consisted of changing language of the contract which referred to “approximately 450 pages of text material” to “approximately 358 pages of text material.” The Contractor claims that during the course of negotiation he was led to believe that he would only have to process a volume of material which could be turned out as approximately 450 text pages. In fact he was required to process a volume of material almost 50 per cent larger, and which resulted in a completed number of text pages totaling 858 pages. 'The modification of the contract resolved the questions :about its scope which then existed between the Contractor and the Government, and we find that there was legal consideration for the modification.
Inasmuch as both the modification and the underlying representations which were stated to justify it, referred only to “text pages,” the decision of the Contracting Officer granting additional compensation in the sum of $5,959.04 is hereby modified. The Contracting Officer should recompute his allowance of additional compensation, basing that allowance only on the additional text pages (408 pages), together with a pro rata allowance for the additional text work included in the extra “combina *597 tion” text and art work pages here involved. If this re-computation should result in an award of less than $5,959.04, the Contracting Officer is hereby directed to take such steps as may he necessary to recover any excess allowance for and on behalf of the Government. Additional compensation allowable to a Contractor pursuant to modification of a contract is limited to the terms of the contract as modified.
Accordingly, the appeal is denied, and action will be taken as above directed.
21. (a) By letter dated August 10, 1960, the contracting officer informed plaintiff that the recomputation as directed by the Administrator’s decision resulted in an allowance of $2,765.46 for additional text pages, and that plaintiff was accordingly requested to refund to the Government $3,193.58 (this being the difference between the sum of $5,959.04 previously paid to plaintiff on the basis of the contracting officer’s decision and the sum of $2,765.46 allowed by the recomputation) .[33]
(b) Plaintiff has not made any refund to FAA in response to the foregoing demand.
22. (a) By letter dated August 16,1960, plaintiff protested the Administrator’s decision.
(b) By letter of the same date (August 16,1960), plaintiff was informed that there was no basis upon which the Administrator could properly reconsider his decision.
23. (a) Plaintiff’s petition, as initially filed on August 26, 1960, seeks recovery of $8,187.92, computed as outlined in finding 19(e) above.
*598 (b) On September 13,1962, plaintiff amended bis petition and increased tbe-amount demanded to $18,452.11.[34]
(c) At tbe pretrial conference on November 18,1962, agreement was reached, pursuant to (then) Hule 38(c), to limit the trial to issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
i24. (a) Trial was held, and the taking of all evidence was completed in January 1963.
(b) On July 29,1963, defendant filed a motion to strike all de novo evidence received in this case and to suspend all further proceedings for a period of time sufficient to afford an opportunity for the parties to return to the Agency to perfect the administrative record, in conformity with the Supreme Court’s decision in United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709 (1963).
(c) On August 9, 1963, the undersigned commissioner, in a written opinion, denied defendant’s motion on the authority of Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963).
(d) On August 14, 1963, defendant requested the court to review and vacate the decision by the commissioner, and to allow defendant’s motion.
(e) On August 30, 1963, the court denied defendant’s request for review without prejudice.
.25. Following is the text of pertinent portions of the codification of the appeals procedure of FAA, as adopted on June 9,1960, and published in 25 F.R. 5151:
§ 2-60.7 Transmittal of notice of appeal.
When the appeal has been received by a contracting officer, he will endorse the date of its receipt on the original and promptly forward the original and one copy thereof, together with one copy of the contract, including specifications, modifications and change orders, his *599 decision, findings of fact and supporting data, and all pertinent correspondence and other data in Ms possession relevant to tbe dispute, to the Chairman, Contract Appeals Panel, Federal Aviation Agency, Washington 25, D.C.
§ 2-60.8 Notification to contractor.
After receipt by him of the material referred to in § 2-60.7, the Chairman will designate one of the members of the Contract Appeals Panel to consider the appeal, notify the contractor of such designation, and supply to him copies of such relevant factual material in the possession of the Government as the Chairman may deem to be desirable in order to assist the contractor to develop his case. In cases of unusual complexity, more than one member may be designated.
% % % % iH
§ 2-60.12 Scope and nature of hearing.
At an oral hearing the member presiding will receive evidence and arguments presented by or on behalf of the contractor. Evidence will not be presented on behalf of the Government. The questions raised by the appeal will be considered de novo, and the Administrator will not be bound by the findings of fact of the contracting officer, although he may adopt them in whole or in part. Hearings will be as informal as may be reasonably permitted under the circumstances. The contractor, or his representatives, may offer at a hearing such evidence or argument as they deem appropriate, subject to the exercise of reasonable discretion by the presiding officer as to the extent and manner of presenting such argument. In the event that the contractor desires to submit additional evidence or argument subsequent to an oral hearing, he will be permitted to do so within a time limit fixed by the presiding officer. In some instances, the evidence presented may be insufficient to permit the formulating of a recommendation. In such cases, the member conducting the hearing may require additional mformation to be submitted.
§ 2-60.13 Evidence.
The contractor may present to the member conducting the hearing sworn statements setting forth the factual material upon which he relies, or he may present witnesses who will testify to such facts. He will be expected to state and establish the grounds upon which his appeal is founded. Testimony and evidence may be submitted without regard to the formal rules of evidence, but shall, *600 nevertheless, be subject to a determination by the member presiding with respect to propriety or relevance.
* * * * *
§2-60.15 Briefs.
Briefs may be submitted in accordance with instructions by the member conducting the hearing, who may request preliminary briefs or statements describing the basis for the appeal and the questions involved in advance of a hearing.
* * * * *
§ 2-60.19 Findings and decisions.
After consideration of the appeal, the member assigned thereto will advise the Administrator with respect. to the case, and the Administrator will make such decision as he deems appropriate. The contractor will be notified of the Administrator’s decision by the Chairman and will be furnished a copy thereof.
* * * * *
§ 2-60.21 Modification of rules.
The rules contained in this part are intended to render the contract appeals procedure just and simple and to prevent unjustifiable expense and delay. They may be relaxed or modified by the member conducting the hearing in the interests of justice and the expeditious settlement of disputes.
Memorandum Opinion
1. The Administrator’s Decision on Appeal is not final or binding because, as even defendant agrees, it was predicated on conclusions of law rather than on disputed questions of fact.
Moreover, the decision did not conform to FAA’s own requirement that “ [A] fter consideration of the appeal, the member assigned thereto will advise the Administrator with respect to the case * * nor did it meet the minimum standards laid down in Morgan v. United States, 298 U.S. 468 (1936), 304 U.S. 1 (1938).
There is serious doubt as to the adequacy of the Administrator’s personal attention to plaintiff’s appeal, but the evidence is hardly sufficient to overcome the presumption of regularity. The fatal flaw in the Administrator’s decision is that it was based upon a recommendation prepared by a *601 subordinate who had neither heard nor weighed the evidence. The Deputy General Counsel who prepared the recommendation heard no witnesses, interviewed none of the participants in the transaction, and had no record before him except a memorandum from the Panel member, the adequacy of which is not disclosed by the evidence.
This failure to comply with minimum standards is sufficient, in my opinion, to vitiate the decision as a whole, including the Summary of Facts as well as the Conclusion.
2. Some of the facts which are crucial to the case, as found by the Administrator, are not supported by substantial evidence, in terms of the evidence presented at the trial de novo in this court. (There was no record of the evidence that was before the FAA Panel member or the Administrator.) Among the Administrator’s findings which are so lacking in support are his statements (a) that plaintiff had access to all of the material at the time he prepared his bid, and (b) that Mr. Owen of plaintiff’s office was fully advised on all aspects of the work by FAA representatives. Mr. Johnson did not know, before making his bid, that all of the material was or could be made available for his inspection, and Mr. Owen was not in the FAA office until after the contract had been signed.
3. The contract in suit consists of the original contract, bearing date of April 3, 1959, as altered by Modification No. 1, effective August 28,1959. The Scope clause of the contract, as modified, required plaintiff “to produce a two volume Instruction Book comprising approximately 858 pages of text material, in addition to Art-work (pictures), and ‘tip-in’ sheets.”
In final form, the Instruction Book contained 898 pages of text instead of 858 pages. Plaintiff asks to be paid for the -extra 40 pages, on the theory that relief in this action, if granted, should cover the entire overrun established by the facts.
Plaintiff is not so entitled, in my opinion. When he agreed with the contracting officer on the modification, the issue .as to an overrun of material had been drawn and thoroughly discussed as between contractor and contracting officer. Plaintiff knew at the time that the final product might en *602 compass more or less than 858 pages. When he agreed to the modification, he agreed to a resolution of the overrun issue in that category, and cannot now be heard to complain.
4. The Scope clause, as modified, required “Art-work (pictures) , and ‘tip-in’ sheets” in addition to the 858 pages-of text material. Defendant contends that the absence of specification of the amount of art work and tip-in sheets is significant because the contract required plaintiff to “perform all necessary labor and provide all necessary materials and equipment to technically and grammatically edit and organize all of the material * * Plaintiff insists that this requirement, when read in conjunction with the further requirement to produce a book “comprising approximately 450 pages of text material, in addition to Art-work * * * and ‘tip-in’ sheets,” was intended to incorporate by reference, so to speak, the language of the Request for Proposals, which said:
The contractor shall be required to produce a * * * Book comprising approximately 450 pages of text material; 60 pages of Art-work (pictures) and 50 pages of tip-in sheets.
Defendant replies, in effect, that the specification of 60 pages of art work and 50 pages of tip-in sheets was superseded by the Summary of Art, which was mentioned in the contract, while the Bequest for Proposals was not.
The essence of defendant’s position is that the contract of April 8, 1959, is clear and unambiguous; that all prior negotiations were merged in it; and that the Summary of Art defined the work which plaintiff was to do, namely, to take all of the text and art material enumerated in the Summary of Art and to prepare therefrom an Instruction Book in accordance with an identified specification.
Plaintiff contends (1) that the contract of April 3, 1959, is ambiguous (specifically as to the meaning of the Scope clause requirement of “* * * approximately 450 pages of text material, in addition to Art-work * * * and ‘tip-in’ sheets”), wherefore the court should review all pre-contract negotiations to determine its meaning; (2) that plaintiff gave a reasonable interpretation to an ambiguous provision, which should be controlling since defendant drew-up the contract; *603 and (3) that “a mutual mistake as to a material fact [viz, defendant’s initial estimates of pages of text and art work] may have taken place requiring a reformation of the contract.”
One test of ambiguity, and perhaps the most realistic, is whether or not the parties themselves have given differing interpretations to the terms of the contract and, if so, whether or not both parties were reasonable in their interpretations;
Here, there is no doubt of the fact that differing interpretations have been made by the parties. The further fact is undisputed that plaintiff, in preparing his response to defendant’s Bequest for Proposals, relied on the estimates contained in the Bequest of 450 pages of text, 60 pages of art, and 50 pages of tip-in sheets. Defendant says plaintiff had no right to rely on those estimates, having been told (so defendant says) that they were unreliable. Where the parties divide, therefore, is over the reasonableness of plaintiff’s action in relying on defendant’s estimates.
Plaintiff’s reliance on the estimates appears to me to have been reasonable under all of the circumstances of the case.
The alternative to reliance on defendant’s estimates would have required of plaintiff a painstaking examination and analysis of all of the material with which he would be required to work. This undertaking might have been a reasonable requirement, if all of the material had been available. The Bequest for Proposals, however, said all of the material was not available, and might not be available at the beginning of the contract work. Some time elapsed after the Bequest for Proposals was drafted before it was issued. During the interim, the materials were assembled, and they were available when plaintiff conferred with representatives of FAA, but the representatives never made this fact known to plaintiff. On the contrary, what they said to him indicated that all of the materials still were not available. He therefore proceeded on what information he had, and acted reasonably in doing so. Defendant’s quantity estimates were an integral part of this action, although defendant had not intended them to be so.
Since plaintiff’s'reliance on defendant’s estimates was reasonable, his interpretation of the Scope clause of the con *604 tract as including those estimates was likewise reasonable. The parties having given differing interpretations to the contract, each one being reasonable under the circumstances, the contract must be said to have contained an ambiguity.
These facts bring the case within the ambit of Cities Service Oil Company v. United States, 118 Ct. Cl. 113, 125 (1950), cert. denied, 341 U.S. 947 (1951), and Pfotzer v. United States, 111 Ct. Cl. 184, 215, 77 F. Supp. 390, cert. denied, 335 U.S. 885 (1948), and warrant reference to the pre-contract negotiation documents as a guide to the meaning of the contract.
At this point the reasoning of Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390 (1947) and Western Contracting Corporation v. United States, 144 Ct. Cl. 318 (1958) applies, and plaintiff is entitled to an equitable adjustment under the Changes article for increases in the cost of work required.
5. The action by the contracting officer in relation to Modification No. 1 reflects a similar approach by him with respect to the overrun of pages of text.
Modification No. 1, as heretofore noted, effected a change in the contract; and plaintiff is bound by the change. He is not entitled to a recomputation of the extent of the overrun of pages of text. That item is fixed at 408 pages by the contract as modified.
6. When plaintiff’s formal claim for increased compensation came before the contracting officer, the same approach again appears to have been used. The contracting officer advised plaintiff that—
* * * the Government * * * recognizes that you did in fact render services over and above that called for within the scope of work under this Contract. * * *
The contracting officer thereupon determined the additional compensation to which plaintiff was entitled for overruns of 408 pages of text, 40 pages of art, and 20 combination pages.
Plaintiff is not bound by the contracting officer’s determination of the increased compensation payable for the extra pages of text, nor by the contracting officer’s determination of *605 tbe extent of or the amount payable for the overruns of art work and tip-in sheets. Plaintiff was entitled to an appeal from the contracting officer’s decision to the head of the Agency. Plaintiff duly and timely made the appeal. When the Administrator failed to act upon the appeal by a decision validly made, plaintiff came to this court for relief, and the court now has jurisdiction to consider and determine de novo plaintiff’s right to an equitable adjustment and the amount thereof within the limits hereinabove defined.
7. Since plaintiff is entitled to an equitable adjustment under the Changes article, it is unnecessary to examine in depth the possibility of a mutual mistake of fact having resulted from defendant’s estimates in its Request for Proposals.
One of the cases cited by plaintiff on this point, however, contains two sentences which are peculiarly apt in relation to the instant case. In Virginia Engineering Co., Inc. v. United States, 101 Ct. Cl. 516, 533 (1944), the court said:
* .* * We must assume * * * that the Government received the benefit of the plaintiff’s additional expenditure which, we have found, was worth what it cost. It is not inequitable, then, to require the Government to pay for what it got. * * *
8. What the Government got in this instance was an overrun of pages of text, art work, and tip-in sheets.
The extent of the overrun of text is fixed at 408 pages.
The extent of the overrun of art work and tip-in sheets cannot be determined without further evidence explicitly relating “combination pages” to art work and tip-in sheets. The reasonable cost per page, of text, art work, and tip-in sheets, is likewise for determination in further proceedings.
The trial of the case was limited in the first instance, by agreement, to the right of plaintiff as a matter of law to recover.
Plaintiff is entitled as a matter of law to an equitable adjustment under the Changes article of the contract. It remains, therefore, to determine in further proceedings the amount, payable to plaintiff by way of an equitable adjustment. This amount may be more or it may be less than the amount plaintiff has already received.
*606 CONCLUSION ON LAW
On the basis of tbe findings of fact, which are incorporated herein, the court concludes as a matter of law that the plaintiff is entitled to an equitable adjustment under the Changes article of the contract, the amount to be determined in further proceedings pursuant to Hule 47 (c). judgment will be reserved pending the incoming of a further report by the commissioner, to whom the case is remanded for the conduct of proceedings in conformity with this order.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 22,1966, that judgment for the plaintiff be entered for $6,162.33, and that defendant’s counterclaim be dismissed.

 The Federal Aviation Agency was created by the Federal Aviation Act of 195S, 72 Stat. 731, to assume the functions of the former Civil Aeronautics .Administration. Although some of the events material to this action occurred ¡prior to the effective date of the 1958 Act, references in these findings are to the FAA without distinction between It and the former CAA.

 Extensive corrections were required in some of the volumes. As far as revealed by the evidence, all needed corrections were made to the satisfaction of EAA.

 International Cooperation Administration.

 The ICA Specialist inserted his estimate for what it might be worth to the Contract Section. It was his understanding that prospective bidders would examine the Litton manuscripts and make their own estimates of the precise magnitude of the job before bidding.

 Mr. Joseph F. Cadigan, sometimes referred to by name in correspondence hereinafter quoted.

 All of the Litton manuscripts were available to PAA by January 21, 1969, although the last volume had not been corrected by Litton.

 Mr. Carl J. Brewer, sometimes referred to by name in correspondence hereinafter quoted.

 Minor variations in the Omnirange Equipment manufactured by Litton, in 1957 from equipment previously furnished made it impossible to use photographs in the memco manual. New photographs would therefore have to be made.

 It was contemplated that these photographs could be taken directly from the memco manual.

 It was contemplated that these drawings could be taken from the memco manual.

 It was contemplated that these drawings would have to be made by a draftsman from actual Omnirange Equipment.

 It was contemplated that these schematics and wiring diagrams could be taken from the mbmco manual.

 These schematic diagrams were in being, in the 26 Litton manuscripts, but were not in form for direct reproduction. It was contemplated that FAA draftsmen would copy them in a form suitable for reproduction.

 By a later count, made after the contract was awarded to plaintiff, the correct number was found to be 911.

 Finding 5(d).

 “It is anticipated' that all of the material to be furnished by the Government may not be available at the commencement of the contract * * *. The prospective bidders may examine the material presently in possession of the Government * * *.” By February 13, 1959, all of the Litton manuscripts were in FAA’s possession.

 Plaintiff is a citizen of the United States engaged in business under the trade name of Edward T. Johnson and Associates, with offices in the District of Columbia. The firm specializes in the preparation of technical and training manuals.

 Some time later, and prior to plaintiff’s response, the Request for Proposals was amended (1) by substituting the date of March 9, 1959, for the date of February 27, 1959, as the deadline for response and (2) by deleting from the fourth paragraph the word “reproducible” in the first line and the words “negative or reproducible” in the second line.

 What appears, superficially, to be a conflict in the testimony is resolved by the probability that, whereas Mr. Brewer had had all of the books, tie had made some of them available to others before plaintiff came to his office.

 Without footnotes.

 The copy of the contract signed by Mr. Cadigan was returned to plaintiff on April 15, 1959. Attached to it was the FAA purchase order, directed to plaintiff, and reciting the transaction in digest form. FAA also prepared and forwarded to plaintiff a Statement and Certificate of Award. These documents were not part of the contract and were of no particular concern to plaintiff. As internal records of FAA, they reflect the nature of the transaction, i.e., procedures for the award of a negotiated lump-sum contract in excess of $2,500.

 Defendant has requested findings as follows relating to the number of pages of text:
“29. The ‘#1 Alternate’ referred to by plaintiff * * * was a Xerox process, wherein a page is typed on a typewriter, photographed, and copies run from the negative of the photograph. * * * This was a deviation from the FAA specification * * *, which prescribed printing * * *.
“The #2 Alternate * * * was a proposal to reproduce the text pages by a printing process in accordance with the FAA specification * * *. * » *
Utilization of the typing-photography method set forth in Alternate #1 would permit only one half of the number of words per page as the printing method * * *.
“46. If the text had been printed as required by specification * * *, rather than typed and then Xeroxed * * *, it could have been placed on half as many pages, and thus would have only occupied approximately 450 pages. * * •”
These requested findings are misleading insofar as they suggest that plaintiff “deviated” from the specification, since the Xerox method was suggested by plaintiff and accepted by FAA as a money-saving substitute for printing.
While one of defendant’s witnesses testified that printing would have reduced the pages on a ratio of 2-for-l, his judgment cannot be accepted as sound. Plaintiff’s Xerox type was single-spaced, two columns to the page. There could not have been such a difference between it and printing. The Litton manuscripts, on the other hand, were in typed matter, double-spaced. Hither printing or Xerox type as used by plaintiff would have resulted in a reduction of them in a ratio of 2rfor-l.

 The letter of transmittal was signed by the Acting Chief, General Materiel Contract Administration unit. This change in personnel and nomenclature reflects a reorganization within S\AA, as a result of which Mr. Cadigan was In effect replaced as contracting officer by Mr. A. Riskln whose previous participation in the transaction, if any, is not disclosed by the evidence.

 Mr. Riskin.

 Finding 17(b).

 Finding 17(a).

 Finding 15(e).

 The codification was published on June 9, 1960, in 25 F.R. 5151. Pertinent portions are set forth hereinbelow in finding 25.

 In support of these contentions, plaintiff relies on the following facts: While plaintiff was represented by counsel, there was no counsel present for FAA. No reporter was present. The Panel member apparently made no notes. No witnesses testified for the Government. Plaintiff was given no Indication of the Government’s position on the claim, nor was he informed of the possibility that amounts previously awarded by the contracting officer would be rescinded by the Administrator.

 Mr. Tyler did not talk to Mr. Cadigan about the matter. The evidence does not disclose the source of his information as to HAA’s side of the controversy.

 The Deputy General Counsel did not talk to the Panel member, to Mr. Cadigan, or to Mr. Brewer. He obtained all of his information from written records, the precise nature or contents of which were not disclosed by the evidence.

 The Administrator did not interview any of his staff nor was it his practice, generally, to read the supporting file which was delivered to him with a recommended decision.

 The recomputation as set forth in the contracting officer’s letter was as follows:
The amount allotted you in our letter of November 9, 1959, was as follows:
408 Text Pages @ $6.53 $2, 664.24
40 Art Pages @ $64.59 2,583.60
20 Combination Pages @ $35.56 711.20
$5, 959. 04
The new computation based on the Administrator’s decision is as follows:
408 Text Pages @ $6.53 $2, 664. 24
11 Combination Pages (Primarily Text) @ $6.53 71.83
9 Combination Pages (Primarily Art) @ $3,265 29. 39
$2, 765.46

 The amendment substituted a new paragraph 12, reading as follows:
“12. Contractor says that as a result of changes and the requirements of extra work, including not only the extra requirements of text pages, but the necessary excess artwork and tip-in sheets and printing costs, additional moneys are due and owing him and he seeks judgment for the additional work on the basis of his additional costs, plus overhead and profit.”