**SYLVANIA ELECTRIC PROD-
UCTS, INC.**

v.

**The UNITED STATES.**

No. 35–67.

United States Court of Claims.

April 14, 1972.

Stephen B. Clarkson, Washington, D. C., for plaintiff. Henry G. Beauregard, Washington, D. C., attorney of record. Sullivan, Beauregard, Meyers & Clarkson, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on May 6, 1971, wherein such facts as are necessary to the opinion are set forth. Requests for review of the commissioner's report and opinion were filed by both parties and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Accordingly, proceedings are suspended herein, pursuant to Rule 167, for a period not to exceed four months to permit the parties to seek reconsideration, in a manner not inconsistent with this opinion, of the decision of the Armed Services Board of Contract Appeals.

* The dissenting opinion of NICHOLS, Judge, follows the opinion of the trial commissioner which has been adopted by the court.

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner:

This is a claim for review and reversal, pursuant to the standards of the Wunderlich Act (41 U.S.C. §§ 321, 322), of a decision of the Armed Services Board of Contracts Appeals denying plaintiff's claim for an equitable adjustment under a contract with the Air Force for the installation at two missile-launching complexes of long-distance cable communication systems, known as "carrier" for their capability of carrying many messages simultaneously. The specifications for the two systems are identical, except for numbering and immaterial punctuation, and all the other relevant facts are sufficiently similar to permit treatment of the dispute as if it concerns one system and one set of specifications.

In dispute is the cost of installing 420 units known as "appliques," whose function it was to connect, and make compatible the signalling characteristics of plaintiff's system, which ran among the launching sites and the command post, and the local systems at each site and post. The local systems, described in the contract as Government-furnished equipment, were in fact built by other contractors.

In computing its bid, plaintiff did not include any amount as a cost for applique units. When required to provide them, plaintiff claimed that they constituted a charge or an extra for which the Government should pay. The issue of entitlement to an award, the only issue decided by the Board, is here raised by cross-motions for summary judgment.

Signalling, as used herein, refers to the electronic means used to get the attention of the party receiving a telephonic communication. In the simple telephone, the operator signals by means of a manual switch, a relay and a bell; dial equipment utilizes an interruption of the flow of current to pulse a relay and a bell.

Signalling characteristics are a matter of the electronic qualities of the system. Where two telephones or systems have compatible signalling characteristics, their connection requires only a simple metal strip between the terminals to be joined. Where the signalling characteristics are incompatible, they are joined or "married" by an applique, a term referring to the electronic combination of, usually, relays, capacitors, resistors, interconnecting wires and a mount. The applique serves as an adapter, converting in both directions the signalling output of one system into signals which can be received by the other. Different telephone systems, even those having generally the same function, may have different, incompatible signalling characteristics.

The signalling characteristics of plaintiff's intersite equipment, as specified in the contract, were of the "E and M" type —"E" for the ear lead, for signals received, and "M" for the mouth lead, for signals sent. Late in the performance of plaintiff's contract, the construction of the intrasite system having lagged behind that of plaintiff's system, it became known that some of the lines of the local system were incompatible with E and M signalling. Plaintiff eventually installed appropriate applique units, sufficiently reserving its rights in writing. Connecting the systems required 420 appliques, for which some $140,000 was claimed before the Board and a larger sum is claimed here.

Plaintiff maintains that the contract, reasonably interpreted, did not require that it furnish appliques without an extra charge; alternatively, that the contract was ambiguous on the subject and that on inquiry the Government stated that the intrasite equipment would have signalling characteristics compatible with plaintiff's equipment and thus that no applique units would be required. While the ultimate issue is one of interpretation of the contract, it is not disputed that the outcome is in large part dependent on the surrounding facts and circumstances.

The general scheme of the specifications called for plaintiff to engineer, furnish and install all the components of a "cable communications system," except for the items specified as to be furnished by the Government. Specifications, ¶ 1–01.[1] The Government-furnished items were to be realty, space in the relevant rooms for the installation of the equipment, the main distribution frame, the place of meeting or "interface" between the two systems, and the local equipment to be installed by others—switching equipment, consoles and telephones. Specifications, ¶ 1–10. It is undisputed that the description of the Government-furnished property does not put on the Government the making of connections between the intersite and intrasite systems. The contract also contained "Government-furnished property," "Changes," and "Disputes" clauses in familiar form; no issue turns on the precise words of these clauses.

Explicit reference to applique units appears twice in the specifications, in paragraphs 1–09 and 4–02, as follows:

1–09 *General Items and Services to be Supplied by the Contractor*

These items and services shall include, but not necessarily be limited to, the following:

\* \* \* \* \* \*

e. Voice frequency termination equipment, including applique units as required to meet the signaling requirements of this specification.

1. 1–01 *Scope of Work*
"This system shall be designed to meet or exceed the individual requirements of Sections 1 through 11 of this specification. The work to be performed under this specification consists of detail engineering, furnishing and installing a cable communications system for the Schilling Missile Complex. This shall include furnishing all plant, materials, equipment, supplies, labor and transportation including fuel, power and water except those materials, utilities or services specified herein to be furnished by the Government. This work shall be performed in strict accordance with this specification. . . . ."

4-02 *Cable System Requirements*

\* \* \* \* \* \*

c. Signalling requirements:

Signalling equipment shall be of the E and M type, with wiring options to achieve other standard signalling arrangements. Applique units shall be furnished where necessary, to meet the signal conditions of Government owned equipment.

The specifications, it is agreed, nowhere give any information as to what would be signalling characteristics of the Government-furnished equipment. Left entirely unanswered was the question of what appliques would in the words of paragraph 4-02c be "necessary, to meet the signal conditions" of the Government-furnished equipment. Once this is recognized, interpretation of the specifications presents no great difficulty.

■ Paragraph 1-09e and the first sentence of paragraph 4-02c say that the equipment furnished by the contractor shall have E and M type signalling characteristics. The second sentence of paragraph 4-02c then continues to state, as clearly as could be wanted, that the contractor shall furnish whatever applique units are needed to connect his E and M type equipment with the Government-furnished local equipment, whose signalling characteristics are not given. The obligation as to applique units was to be determined by the signalling characteristics of the Government-furnished intrasite system, whatever they were. The Board was, therefore, correct in its interpretation of the specifications as requiring the contractor to supply whatever applique units turned out to be necessary to connect and make compatible the contractor-supplied intersite system with the local system.

Plaintiff's several efforts directly to controvert the foregoing interpretation may be disposed of summarily:

■ a. Applique units are said not to be required or "necessary" because plaintiff's equipment did not itself need applique units. The contention ignores the words in paragraph 4-02c which follow the word "necessary." The paragraph does not merely require the contractor to furnish the appliques "necessary" but rather the appliques "necessary, to meet the signal conditions of Government owned equipment."

■ b. "Government owned" in paragraph 4-02c does not, plaintiff says, mean "Government-furnished." It could not mean anything else.

c. Plaintiff also contends that appliques are equipment required to make Government-furnished property, the intrasite local systems, suitable for use, and are thus to be paid for under the Government-furnished property clause. This contention gets marks for ingenuity but cannot avoid the explicit provisions of paragraph 4-02c.

■ d. Another fanciful contention is that a commercial practice calling for installation of appliques by the local telephone company was incorporated into the specifications by a statement on the cover of the specifications that it "was prepared to translate operational requirements into standard commercial equipment components and shall in no way be construed as a Military Specification."

e. An applique is said to be the same as a certain part called an attenuation pad, concededly not required to be furnished by plaintiff. Applique units are too specifically dealt with in the specifications to allow for such arguments. Moreover, there is at last some testimony that "applique" and "attenuation pad" are not interchangeable terms.

f. Last of these contentions is one that reasons from certain other contracts in which, it is said, under similar language the Government exempted the contractors from the obligation to install appliques. The Board reasonably and sustainably found that the circumstances were sufficiently different to deprive the cited episodes of significance.

Plaintiff's alternative position is a series of arguments whose theme is a claimed indefiniteness or incompleteness of the contract language as to appliques. The contract, it is said, contained a

latent ambiguity as to appliques, which plaintiff read reasonably; if not, the contract was as to appliques too indefinite for enforcement; and if not that, then the ambiguity was patent and on inquiry by plaintiff, the Government stated that no appliques would be necessary.

■ Thus plaintiff argues first that the words "as required" in paragraph 1–09e and "where necessary" in paragraph 4–02c are latently ambiguous as to need, number and type of appliques; that plaintiff reasonably read the words as creating an obligation to furnish appliques at a later date, on a provisioning or spare-parts basis, the Government to have an option to buy them in a later, separate commitment and for a separate, negotiated price, when the need and type of appliques became known.

This argument will not wash. Appliques have no similarity to spare parts. Where an applique is necessary, the telephone will not ring without it. Paragraph 4–02c of the specifications, entitled *Cable System Requirements* and obviously referring to the present contract, says bluntly that "Applique units shall be furnished". The added words "where necessary, to meet the signal conditions of Government owned equipment" constitute the standard for determining the number and type of appliques to be furnished. Neither these nor any other words postpone the obligation to another contract or condition it on a further payment by the Government.

■ The claim of total indefiniteness of obligations as to appliques must also fail. The law does not encourage the claims of parties to contracts that obligations are too indefinite for enforcement. A now-classic response to a claim of indefiniteness was given in a case of a dealership in motor cars, disposing of the contentions that the dealer's obligations were too vague for enforcement. "There is no objection to a promise that it is in-

definite so long as the parties can tell when it has been performed, and it is enough if, when the time arrives there shall be in existence some standard by which that can be tested." Judge Learned Hand, in Moon Motor Car Co. of N. Y. v. Moon Motor Car Co., 29 F.2d 3, 4 (2d Cir. 1928).

■ This was no contract to provide appliques, without detail as to their number or type. It was a contract to install a precisely described telephone system in working order,[2] connecting it to another system by means of whatever appliques were "necessary to meet the signal conditions" of the other system. The objective needs of the system to be installed were the standard for performance, and supplied the necessary certainty. Restatement, Contracts § 32 (1932); 1 Williston, Contracts (3rd Ed.) § 47 (1957). In fact the standard served, as contemplated, as a measure for plaintiff's performance. When the time came, plaintiff learned from the nature of the other system what connections were needed, made them and completed the contract on time.

Plaintiff cites sources of Government procurement law for such propositions as that invitations to bid must be sufficiently detailed to permit bidders to present competitive bids for the same goods or services (ASPR § 2–201; Navy Contract Law, § 2.4 (2d ed. 1959)), and that procurement contracts must call for specific goods to be delivered and cannot consist of indefinite obligations (Navy Contract Law, *supra*, §§ 4.27–4.30). Granted that it would be helpful in bidding, and desirable whether in a Government or private procurement system, for the specifications to state the number and type of appliques to be furnished. But the information was not available at the time the contract was awarded. Every detail and contingency of construction cannot be known in advance, and the contract does not, as

2. The phrase "working system" appears in the specifications in ¶ 1–07, *Site Investigation:*
"It shall be the responsibility of the contractor to make his own site(s) in-

vestigation. While the information contained herein is to our knowledge correct, the contractor has the sole responsibility for producing a working system in accordance with this specification."

plaintiff charges, become a pig in a poke for failure to state every such detail where a definite standard is laid down for what is to be built and furnished. The specifications in paragraph 2–01 explicitly contemplated that some "details of design and construction" were not being specified, and "shall conform to the best engineering practices." Further, that "any unit, part or item necessary for proper operation" "shall be supplied," though not "specifically described or called for by this specification." [3] Certainty is often supplied in this manner, by reference to standards such as usage, good engineering practice or proper operation. *See* Restatement, Contracts *supra*, § 32.

 Omissions of details of magnitude in terms of money create problems for bidders, but there are some simple methods for solving or alleviating the problem. The most obvious is an inquiry to the procurement authorities. Such an inquiry was made in this case, and it is the basis of plaintiff's last and most potent contention—that a patent ambiguity in the specifications as to appliques was on inquiry clarified by the Government in a statement which meant that no appliques would be needed.

The setting is the so-called two-step method by which the procurement was accomplished. The specifications were first advertised, with a request that bidders submit an unpriced technical proposal demonstrating their ability to perform, and then those who were on the basis on their technical proposals adjudged qualified were in the second step invited to submit priced bids. Between the first advertising and the submission of the technical proposals, a meeting was held for interested bidders, at which qualified technical and procurement officers were present to answer questions about the specifications.

At the meeting, called the bidders' conference, a representative of plaintiff asked what would be the signalling characteristics of the Government-furnished equipment; the answer was that the equipment would be E and M type, that is, the same as plaintiff's equipment. The answer of course meant that appliques would not be necessary. Thereafter, plaintiff submitted its technical proposal, which stated that "applique units can be furnished, where necessary to meet the signalling conditions of the Government owned equipment." Plaintiff and others were held qualified, and the bids followed. The bid submitted by plaintiff did not include any amount for either applique units or contingencies.

The relevant testimony was as follows:

Mr. Bean, manager of Lenkurt, the subcontractor for telephone equipment, testified that information on the signalling characteristics of the various items of Government-furnished equipment was indispensable for any decision on whether and what kind of appliques would be necessary; that the specifications gave no hint on the subject, and were "wide open" in requiring any kind of applique that might turn out to be necessary to connect the Lenkurt equipment to the Government-furnished equipment. Inquiries by his company (apparently he himself made none) to the prime bidder, Sylvania, he said, did not provide the information; his company advised Sylvania that there was insufficient information on appliques on which to base an item in the bid. He did not have the information with which to compute an amount in the bid, either an amount for appliques or a reasonably estimate basis for a contingency for appliques, and therefore did not put any amount into the bid for appliques.

---

3. 2–01 *Design and Construction*
 "a. General: The detailed mechanical and electronic design construction of the equipment shall be accomplished subject to the requirements of this specification. Details of design and construction not specified shall conform to the best engineering practices. Any unit, part, or item necessary for proper operation in accordance with requirements and not contained herein shall be supplied even though that unit, part, or item may not be specifically described or called for by this specification."

He did not attend the bidders' conference and did not know whether Lenkurt's Eastern representative attended. (Lenkurt's plant was on the West Coast.) He would have desired a contingency in the bid, but Sylvania had instructed that there were to be no contingencies. He used the word "can" in the technical proposal, he said, because he had no information: "I wanted to indicate that although I did not know what was possibly needed that we, as a contractor, would be ready to put it in, we would be prepared to put it in, when and if it were determined to be necessary."

On Sylvania's case-in-chief, Mr. Murphy, Sylvania's manager, confirmed that the bid contained nothing for appliques and nothing for contingencies. Without information as to signalling requirements, he said, it was impossible to know whether and what appliques would be necessary. The information was not to be had from the specifications, and was not learned until long after the award. He and Bean consulted on the word "can" in the technical proposal; it expressed, he said, Sylvania's understanding of the specifications, which was that appliques were to be supplied in a future commitment, as a provisional item, for an additional payment.

Then, in the course of its case, the Government called a Mr. Ernst, the senior Government "buyer" on the contract, who had been present at the bidders' conference. He testified that no questions concerning appliques were asked of him at the conference, but admitted on cross-examination that he was not technically qualified to understand or answer such questions.

In rebuttal of Mr. Ernst's testimony, plaintiff recalled Mr. Murphy, who testified that he attended the bidders' conference; that a Sylvania representative asked the "basic question" as to the type of signalling "we would have to meet;" and that a Mr. Cornelius, a technical representative of the Air Force, responded that "the Government-owned equipment would require E and M type signalling," which meant that no appliques

would be required. Others of the Government's representatives who had attended the bidders' conference (but not Mr. Cornelius) were present at the hearing and were not called.

The Board accepted it as fact that at the bidders' conference Mr. Cornelius stated for the Government that (in effect) no appliques would be needed:

At the meeting a representative of appellant asked the cognizant technical representative of respondent what the signal conditions of the Government-owned intrasite equipment would be and was told that it would have E and M type signalling. Since E and M was the type specified for the inter-site systems, that would eliminate any need for applique units because the intersite and intra-site systems would be compatible (Tr. 556–575, 822–825).

The opinion does not recognize any contradiction between the testimony that from the Government's statement at the bidders' conference, plaintiff knew, albeit erroneously, that no appliques would be required and the testimony that plaintiff had no information, prior to the award, as to whether and what appliques would be required. The decision must therefore be tested on the assumption of an effective finding that the Government stated, at the bidders' conference, that no appliques would be required.

Despite this finding, the Board rejected plaintiff's contentions based on the conference, on the grounds, first, that plaintiff did not rely on the Government's statement at the conference, but rather relied on an interpretation of the contract that appliques would be required and, second, that in any event the formal contract was so completely integrated as to prevent consideration of, and supersede, even an agreement at the bidders' conference amending the specifications to eliminate any requirement of appliques.

Dispositive against the plaintiff, the Board felt, was the plaintiff's failure to prove it had "relied on the Government's statement" or "treated the answer as an amendment to the specifications." The

nonreliance, the Board held, was demonstrated by the fact that Mr. Bean, who computed the bid, was obviously not told about the statement at the bidders' conference, and by a failure of proof that plaintiff "independently relied" upon the answer, or that the parties "treated" the answer as an amendment of the specifications. The Board said:

Although the putting of the question by appellant's representative had apparently been generated by a request to appellant from the subcontractor who actually designed the inter-site cable systems subsequently offered by appellant and whose area of responsibility to appellant would have included any problem involving applique units, it appears that the subcontractor was not informed of the answer given by respondent's technical representative at the meeting (Tr. 226–228), and there is no evidence that appellant independently relied upon the answer, or that the parties treated the answer as an amendment to the specifications.

This decision was in my opinion error. Mr. Bean, an employee of the subcontractor, was quite low in the hierarchy. He did not attend the bidders' conference and did not know who, if anybody, had attended for his firm. His ignorance of what went on at the bidders' conference is of no consequence in view of the other proof. It appeared that plaintiff was told, at the conference, that no appliques would be necessary. In fact the bid contained nothing either for appliques or contingencies. Plaintiff's top management knew, if Mr. Bean did not, of the Government's assurance that no appliques would be needed, of the effect of that statement on the specifications, and of the harmony of the statement and the inability of those engaged in computing the bid to arrive at a sum for appliques for inclusion in the bid. With this knowledge, it became unnecessary for management either to advise Mr. Bean to change his proposed bid (he having included nothing for appliques), to consider any revision of plaintiff's own decision to include no contingencies in the bid, or, indeed, further to concern itself with appliques. Once plaintiff's representative at the bidders' conference heard Mr. Cornelius' answer—whose meaning no one could misunderstand—plaintiff could safely do just what it did—submit the bid as prepared.

Looking at the proof that was made, it appears that there was evidence that in computing the bid plaintiff was concerned about appliques and would have included a sum for appliques had the specifications disclosed a basis for computation of the sum; that on finding the specifications incomplete and unclear as to appliques, plaintiff specifically asked a pointed question, and the Government responded that no appliques would be required; that, of course, the Government's statement had an all but overwhelming tendency to induce the submission of a bid without any sum in it for appliques; that after hearing the Government's statement, the plaintiff, despite its earlier concern over the question, submitted a bid without any amount in it for appliques or for contingencies.

This evidence amply proved reliance. It requires only the smallest teleological inference to connect the overwhelmingly likely result of the Government's statement—the inducing of a bid sans amount or contingency for appliques—with the happening in fact of that result—the submission of just such a bid. It is excessive to put plaintiff to the additional hazard of a demand for proof of knowing reliance by such a low-level agent as Mr. Bean.

There is error, too, in the Board's further holding that rather than relying on the interchange at the bidders' conference, the plaintiff relied on an interpretation of the contract as meaning that appliques might be needed. The evidence relied on by the Board gives no support for the conclusion drawn.

The first item relied upon is plaintiff's demands as the work progressed for information as to the need for appliques. These were, however, accompanied by a reservation of a right to payment and were thus consistent with plaintiff's

spare-parts interpretation of the contract. Mr. Murphy's testimony, also relied upon by the Board, was that plaintiff interpreted the contract as providing that appliques were to be supplied on a provisioning or spare-parts basis, in a separate commitment, for a separate charge. (The Board overstates his testimony, in describing it as a simple acknowledgment that the contract meant that appliques would be required in the future.)[4] There is no necessary conflict between the statement at the bidders' conference and the interpretation testified to by Mr. Murphy. Only a foolhardy bidder would allow the Government's written specifications to displace entirely its explicit oral statement, or vice versa, if it was at all possible to hold to both. Plaintiff could quite consistently continue to interpret the contract as requiring that it must stand ready to furnish appliques on a "spare-parts" basis, for an extra payment, at a future time, and at the same time believe the oral statement, made with the specifications in mind, that no appliques would be required.

The technical proposal that followed the bidders' conference, the last leg of the Board's conclusion that plaintiff interpreted the contract as requiring appliques, also does not bear the load put on it. Plaintiff had affirmatively argued from the technical proposal that the use of the word "can," instead of "will," put the Government on notice of the ambiguity in the specification language. Rejecting this argument, the Board held that the technical proposal was designed only to show plaintiff's capability to perform the contract, and that this purpose explained the word "can." The word should not be regarded as pregnant with other implications than the desire to show capability. The Government's statement at the bidders' conference gave rise to no particular need to omit affirmations of plaintiff's technical capability.

In sum, plaintiff's expression of its capability by the use of the word "can," its "spare-parts" interpretation of the specifications and its reliance on the statement at the bidders' conference were all consistent with each other. Neither the "spare-parts" interpretation nor the word "can" may be used to negate the sum total of the evidence that plaintiff was induced by the statement at the bidders' conference to put in a bid without provision for appliques or contingencies.

■ The contradiction between the Board's findings on what plaintiff knew concerning appliques, at the time it submitted its bid, must now be considered. Findings of fact by the Board, supported by substantial evidence, are given final effect in the courts. 41 U.S.C. § 321. The difficulty in applying this basic principle is that the opinion contains find-

4. The Board quotes the following from Mr. Murphy's testimony:

"A I interpreted this requirement as a requirement to supply the applique units in the future when the characteristics were known and the quantities were known. (Tr. 331)"

The quotation ignores two fuller answers, explaining that the requirement was to be the subject of a future commitment. Only a page or two before, the witness had said:

"A With reference to paragraph 1–09e on page 6 of [the specifications], it was Sylvania's intention to supply the applique units as a provisional item to the contract, that the terminology as required inferred that we would have the obligation to supply the applique units when the types and quantities were known and that this further obligation was one to be met in a future commitment on the part of Sylvania to supply the hardware. The terminology as required was too indefinite to at that time determine what and how many were to be supplied. (Tr. 328–29)

\* \* \* \* \*

"A It further states in the paragraph, which is paragraph 4–02f [4–02c in the specifications referred to in this opinion], that applique units shall be furnished where necessary to meet the signalling conditions of government owned equipment. Again we have "as required" and "where necessary" as an indeterminate type and quantity of equipment to be supplied as a future requirement. (Tr. 329)"

ings of fact, all supported by ample evidence, which go in opposite directions.

On the one hand, on the substantial evidence of the testimony given on plaintiff's case-in-chief, the Board found that the bid contained no sum for appliques, for lack, at the time, of any information as to the signalling characteristics of the equipment to be furnished by the Government, and that knowledge of those characteristics became available only long after the award. On the other hand, on the substantial evidence of the rebuttal testimony of Mr. Murphy concerning the bidders' conference, the Board found that at the time plaintiff made its bid, it had information from the Government, albeit wrong information, that no appliques would be required.

The grub is of course that it is impossible to give final effect to both findings. If the Government told plaintiff at the conference that no appliques would be needed, then it cannot be that plaintiff had no knowledge at the time of the bid. The reverse is equally true; if plaintiff had no knowledge concerning appliques at the time of the bid, and got knowledge only long after the work was underway, it could not have been told what it was told at the bidders' conference.

The impasse might be rationalized by treating the Board's decision on reliance as an implicit rejection as incredible of the testimony of the question and answer at the bidders' conference. This course would in my opinion encroach upon the Board's functions as trier of the facts and judge of the credibility of witness (Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966); Tecon Corp. v. United States, 188 Ct.Cl. 436, 451, 411 F.2d 1271, 1280 (1969)). A court in reviewing a Board decision should not speculate that the Board meant otherwise than it said, in finding as a fact that a certain question was asked and an answer given at a bidders' conference, or that it meant, though it did not say, that a particular witness was incredible in a part but not all of his testimony.

Review is impossible when findings are so contradictory as these. Only reconciliation by the Board of the apparent contradictions can prepare the case for performance of this court's function of review. "Where . . . we remain unsure of the exact findings made and the legal standard used by the Board (and the evidence is not so overwhelming as to justify our making our own finding) the procedure outlined by the Supreme Court in its trilogy of decisions concerned with Wunderlich Act review leaves no option other than to remand the case to the Board for clarification." [Footnote omitted.] Koppers Co. v. United States, 405 F.2d 554, 559, 186 Ct.Cl. 142, 150 (1968).

If the Board meant to reject a part of the testimony, it will be a simple enough matter for it to say so, on the remand. The only loss will be one of time.[5] The gain will be the preservation of the Board's lawful jurisdiction, and, possibly, recognition as just of a claim which cannot be upheld on the present contradictory findings.

On reconsideration during the suspension of proceedings for that purpose, and after any further proceedings deemed appropriate, the Board should clarify its view of the facts and resolve the contradictions in the testimony, in separately stated findings, accepting what it deems credible and proven, and rejecting or reconciling contradictory testimony.

On reconsideration, too, the Board should take a different view of the law than seems to be reflected in its alternative holding—that the written agreement between the parties was so complete-

---

5. The necessity of a remand is particularly regretted in view of the long pendency of the case, instituted in 1967. This case is one of those whose apparent delay in disposition is due to their close connection with related cases which remain undecided administratively long after the primary case is brought in this court. Consideration of the case has been deferred until now, in accordance with the wishes of counsel, because of the administrative pendency of such a related case.

ly integrated as to supersede an oral agreement at the bidders' conference concerning appliques, "If any there had been." This ground was expressed in the following passage in the opinion:

> The invitation, appellant's bid, and respondent's acceptance of appellant's bid all purported to be based on the specification language we have described and constituted, we have no doubt, a complete integration of the contract between the parties, excluding any inconsistent prior understanding, if any there had been, based on the meeting in the first phase or the language of appellant's technical proposal (Rule 6, Encl. 1). See Restatement of the Law of Contracts, §§ 237, 240.

Perhaps because of the brevity of the Board's treatment of the matter, this decision seems to misconstrue the interplay between the parol evidence rule, the rules concerning the integration of agreements and the effect under these rules of additional oral terms of partly and completely integrated agreements, matters of law highly relevant for the Board's reconsideration. In consequence, the decision errs in at least one major respect—in characterizing the alleged oral agreement at the bidders' conference (if made) as inconsistent with the written agreement.

 The function of the parol evidence rule, a rule of substantive law misnamed a rule of evidence, is the prevention of the variance of integrated agreements, usually written, by inconsistent contemporaneous or prior terms, usually oral. Restatement, Contracts, *supra*, §§ 237, 240, 241. Interpretation, however, must precede awareness of variance. And meaning can usually be given to a writing only on consideration of all the circumstances, including the prior negotiations between the parties. The parol evidence rule is therefore no bar to the use of the oral statements of the parties during negotiations, in aid of the interpretation of ambiguous or uncertain clauses in written agreements. Restatement, Contracts, *supra*, §§ 238, 230, 231; 3 Corbin, Contracts, §§ 543, 579 (1960). Expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text. *E. g.*, Martin Co. v. United States, 169 F.Supp. 524, 527, 144 Ct.Cl. 714, 719 (1959) ("The expressions in the negotiations leave no doubt whatever as to what the parties meant by Article XIV."); Johnson v. United States, 173 Ct.Cl. 561, 604 (1965); Olin Mathieson Chemical Corp., ASBCA No. 7401, 1962 BCA ¶ 3596; Space Technology Laboratories, ASBCA No. 7676, 1962 BCA ¶ 3609.

If, therefore, the written specifications are deemed to be ambiguous or unclear as to appliques, the oral negotiations are admissible to help clear up the uncertainty.

 Except as preventing the contradiction of written agreements, moreover, the parol evidence rule is no bar, too, to extrinsic, parol evidence supplementing the terms of even a final written agreement by *consistent* additional terms, unless, in the words of the Uniform Commercial Code, "the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." Uniform Commercial Code § 2–202;[6] 3 Corbin, Con-

---

6. "§ 2-202. *Final Written Expression: Parol or Extrinsic Evidence.*—Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

 \* \* \* \* \*

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The *Uniform Laws Comment* to this section states in part:

"3. Under paragraph (b) consistent additional terms, not reduced to writing may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms. \* \* \*"

tracts (3d Ed.), §§ 582, 583, 585, 588; 4 Williston Contracts, *supra*, §§ 604, 631, 633, 638, 639; *compare* Restatement, Contracts, *supra*, §§ 240, 228, 229 *with* Restatement, Contracts Second-Tentative Draft No. 5, §§ 242, 235, 236 (1970).[7]

The rationale for this rule, as always in the law of contracts, is the intention of the parties. Where the parties intend that their written agreement shall not only be final, but be also the exclusive statement of *all* their agreements, even a consistent prior oral agreement is superseded and overridden by the written agreement, termed a completely integrated agreement. Where there is no such intention, the agreement is only partly integrated and a consistent, oral collateral agreement is effective to supplement a written agreement.

The supplementation of a partially integrated agreement by consistent additional oral terms does no violence to the finality of the writing. A writing intended to be final so far as it goes may nevertheless not be intended to contain all the agreements of the parties on the subject. Section 2–202 of the Uniform Commercial Code, *supra*, n. 6, for instance, "definitely rejects * * * [a]ny assumption that because a writing

has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon." Uniform Laws Comment, Uniform Commercial Code § 2–202.

Parol or extrinsic evidence must be admissible on the issue of the extent to which a written agreement is integrated, for as has been said, the writing cannot prove its own integration. 3 Corbin, Contracts, *supra*, § 582; *see also* 9 Wigmore, Evidence, §§ 2400(5), 2470 (1940). Accordingly, "any relevant evidence" is admissible on whether the parties intended their written agreement to be a complete and exclusive statement of all the terms of their agreement. Restatement, Contracts, *supra*, § 228, comment (a); *see also* 3 Corbin, Contracts, *supra*, §§ 581, 582, 588.[8]

Application to the facts of the foregoing principles raises two closely related questions for decision by the court.[9] One is whether the oral graft to the specifications by the evidence of the bidders' conference is contradictory of or consistent with the written agreement. If it is inconsistent, the parol evidence rule would bar it, even if the written agreement is only partially integrated. The second question is whether all the cir-

7. The rule allowing consistent additional terms is sometimes called the "collateral agreement" rule. The Restatement in § 240 recognizes consistent oral terms additional to a written contract in two situations—when supported by separate consideration or when consisting of "such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement." In the U.C.C. and in § 242 of Tentative Draft No. 5 of the Restatement, Contracts Second, these two categories of collateral agreements are treated as illustrations only of a not completely integrated agreement.

8. For instance, in a suit involving a written lease of a building without heating facilities, the Supreme Court of Rhode Island held it permissible to prove a prior oral agreement that the lessor would provide heat from an adjoining building. Rejecting the plea that the unambiguous lease, omitting all reference to heating, could not be affected by the prior oral

agreement, the court held that "wide latitude must be allowed for inquiry as to whether the parties intended that the writing constitute an integration of all of their prior agreements and negotiations." Golden Gate Corp. v. Barrington College, 199 A.2d 586, 590 (Sup.Ct. R.I.1964); Restatement, Contracts Second-Tentative Draft No. 5, *supra*, § 236, comment b, illus. 1.

9. The question whether an agreement is completely integrated so as to supersede prior agreements is a question of law, for decision by this court without regard to the decision of the Board. Seitz v. Brewers' Refrigerating Machine Co., 141 U.S. 510, 517, 12 S.Ct. 46, 48, 35 L.Ed. 837 (1891), ("[w]hether the written contract fully expressed the terms of the agreement was a question for the court"); U.C.C. § 2–202b, *supra* n. 6; 4 Williston, Contracts, *supra*, § 604; Restatement, Contracts Second-Tentative Draft No. 5, *supra*, § 235.

cumstances were such as show an intention by the parties that any oral agreement should not survive the written execution of the contract or, in other words, an intention that the formal written agreement should not only be their final, but also their exclusive agreement on all subjects. Such an exclusive agreement would be a completely integrated one, excluding not only the "inconsistent prior understanding, if any there had been," referred to by the Board but any prior oral understanding with respect to appliques or signalling characteristics, one of the subjects of the written agreement.

Much light is cast for the answers to both these questions by a case decided in 1944 by the War Department Board of Contract Appeals, a predecessor of the instant Board, Appeal of Wikstrom, 2 CCF 638 (WDBCA 1944).

The contract was one for the construction of railroad line, and the written specifications allowed the contractor to use either crushed stone or cinders as ballast. Stone cost more than cinders. After the bids were received, the contracting officer, preferring stone and desirous of determining whose bid was lowest, asked the plaintiff whether his bid was computed on the basis of stone or cinders, was told stone, and awarded the contract to him. The question was the plaintiff's right to exercise the option in the contract to use cinders.

The War Department Board of Contract Appeals held that the oral interchange could be considered despite the parol evidence rule and, on such consideration, that the interchange had replaced the option in the written contract with an obligation to use stone. The specifications were held to be indefinite as to the type of material to be used as ballast until they were clarified by the oral interchange. Cases under the parol evidence rule, cited to the Board, were held to be attempts by parol "to alter, change and modify" the terms of written instruments. Here, the Board said, "the understanding that stone ballast would

be used clarified, made definite, the intentions, rights and obligations." Once the oral agreement was made, the Board said, it was "not necessary to change the original specifications by addenda, change order or otherwise."

If an oral agreement for the use of stone is not contradictory of a written agreement for optional use of stone or cinders, there is surely no contradiction between an oral agreement that equipment to be furnished by the Government will be compatible with the contractor's equipment and a written agreement that the contractor will furnish whatever appliques will be necessary to make his equipment compatible with the equipment furnished by the Government.

In both *Wikstrom* and in the instant case, the sequence of events, in which written specifications came first and were followed by an oral interchange, and the nature of the meeting at which the interchange took place, goes far to confirm both that the oral term is not contradictory of the written specification and that the formally executed written agreement was not intended to supersede the oral agreement. The bidders' conference, here, was no ordinary pre-formal-execution meeting of ordinary parties of the first and second parts. Leading electronic concerns had been asked by the Air Force to demonstrate their technical proficiency to perform a multimillion-dollar contract for a national defense communications system of a new and complex type. Uncertainties in the written specifications might unless dispelled lead to contingencies, variations in the prices bid and consequent extra costs to the Government or, worse, defective performance of work of importance to the national security. Accordingly, the prospective bidders were invited to send their representatives to a meeting where they were encouraged to ask questions of Air Force representatives present, qualified and authorized to explain to those gathered the meaning of the specifications, to fill in any gaps in the specifications and eliminate any uncertainties

in the minds of bidders.[10] The contracting officer, the senior buyer and the technically knowledgeable officers were there, each responsible for questions in his own field.[11] The obvious gap in the specifications as to appliques led to an "inevitable" question at the conference, and the answer filled in the specifications.

The second of the dispositive questions set out above, as to the intent of the parties, may now also be answered in favor of the plaintiff. Since the words spoken at the bidders' conference were intended as an addition to the specifications, to resolve an open question and doubt in the minds of the bidders, it could not have been intended that those words should be wiped from the record by the formal execution of the contract. Quite the contrary.

To hold that the writing signed following such a conference as here took place negates the oral agreement reached at the conference would be reckless of the reputation of the procurement system in which bidders' conferences are an integral part. Meetings between Government procurement officers and prospective bidders would become a sham. Questions would be useless, for answers would be without force, and the amounts of the bids received would soon show the results. Respect for the answer is required by the respect given the Government's procurement process.

■ It is therefore concluded that the written agreement here was not so completely integrated as to bar consideration of an oral agreement at the bidders' conference that the signalling characteristics of the Government-furnished equipment would in fact be compatible with the characteristics of plaintiff's equipment, if such an agreement is found to have been made. Neither the rules governing integrated agreements nor the

parol evidence rule would in the circumstances prevent the enforcement of such an agreement.

### CONCLUSION

For the reasons stated, pursuant to Rule 167, with which plaintiff shall comply, proceedings are suspended for a period not to exceed four months to permit the parties to seek reconsideration, in a manner not inconsistent with this opinion, of the decision of the Armed Services Board of Contract Appeals.

NICHOLS, Judge (dissenting):

It appears to me there is a fallacy in the commissioner's recommended opinion, namely, he assumes that the defendant's statements at the April 21 pre-bid conference were promissory in nature. I read them as misstatements of fact. They fall in the same category as the erroneous weather information the Government supplied in Chris Berg, Inc. v. United States, 404 F.2d 364, 186 Ct.Cl. 389 (1968). There the ASBCA dismissed the Wunderlich Act claim as outside its jurisdiction and we tried it and granted relief as a breach claim. The plaintiff, as part of its proofs, showed it relied on the misinformation given and because of it made no provision in the bid for storm damage. The parties here might, I think, waive the breach and treat the case as for Wunderlich Act relief, but should not by so doing be able to transform the proofs required. The claim is *ex contractu* on either theory. Suppose it would be wrong to require the plaintiff to show express reliance on a promissory undertaking in a pre-bid conference, it would not follow it was wrong to require express reliance on a factual misstatement not amounting to a promise.

Here plaintiff could very easily have produced testimony, if true, that it pre-

---

10. The senior buyer testified:
 "Yes, at the bidders' conference I instructed all bidders that this was their opportunity to ask any and all technical questions that they might have since we had Air Force engineers represented."

11. Authority to bind the Government by the answers is not challenged. Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 238–240 (1960); Centre Mfg. Co. v. United States, 392 F.2d 229, 230–237, 183 Ct.Cl. 115, 126–128 (1968).

pared its bid and omitted any provision for the cost of appliques in reliance on the pre-bid conference. It did not do so and instead offered other fallacious and unacceptable or insufficient reasons for the omission. It must have learned at some time and in some way that the pre-bid information was mistaken. If this knowledge came after the bid it would have been a fact helpful to plaintiff, if before, hurtful, but the time and manner were left in doubt, and the Board made no finding, merely noting that plaintiff was in ignorance as to the number of appliques required until long after the award, and made repeated inquiries in vain. This failure to come forward with evidence undoubtedly in plaintiff's control would justify an inference that if produced, it would have been unfavorable to plaintiff.

In the circumstances, the finding that plaintiff did not rely on the pre-bid information I deem supported by substantial evidence and not inconsistent with the finding that the pre-bid mistaken information was given and received. The commissioner is wrong in inferring reliance from the latter finding without other evidentiary support. The conclusion follows that plaintiff is not entitled to recover.

The decision under review was the work of a very able panel. One of its members has since become one of our commissioners. Even if this were not so, our appellate review should proceed on the assumption that the Board did a lawyerlike job and should interpret findings on that basis. I cannot join in seeing a contradiction between the Board's findings that plaintiff knew from the pre-bid conference, albeit erroneously, that appliques would not be required, and its finding that the *true* facts were unavailable until late in 1960. Just read in the word *true* and the contradiction vanishes. The Board also found that plaintiff began about six weeks after the award, on September 21, 1960, demanding information relevant to the design and furnishing of appliques. It seems obvious, as

stated above, though not expressly found, that if plaintiff ever relied on the pre-bid information, it had ceased to do so by September 21, 1960. Again, there is no inconsistency.