### The MONTANA POWER COMPANY

v.

### The UNITED STATES.

No. 123–82C.

United States Claims Court.

Sept. 24, 1985.

John D. McGrane, Washington, D.C., for plaintiff.

Sara V. Greenberg, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., Sylvia Jensen, Bonneville Power Admin., Portland, Or., of counsel.

## OPINION

MARGOLIS, Judge.

The plaintiff brought this action for breach of contract against the United States seeking damages, interest, costs, and attorneys' fees. The parties have cross moved for summary judgment on the issue of liability. The defendant has also counterclaimed to recover money it claims to have paid by mistake. After considering the record and hearing oral argument, the Court grants the plaintiff's motion and denies the defendant's motion and counterclaim.

## FACTS

The parties have agreed upon the following facts:

### A. *The Coordination Agreement*

On September 15, 1964, fifteen parties executed an agreement entitled "Pacific Northwest Coordination Agreement for the Coordination of Operations Among Power Systems of the Pacific Northwest" [Coordination Agreement]. Among those parties were the plaintiff, Montana Power Company [Montana Power], and the defendant, the United States, which acted through the Bonneville Power Administration [BPA]. Montana Power, the BPA, and the other parties own or operate hydroelectric projects in the Pacific Northwest. They entered the Coordination Agreement to save money and power by planning the flow of water and electricity among the projects.

The Agreement requires downstream project owners to pay upstream owners a share of the annual power cost of the upstream dams and reservoirs in return for coordinated storage releases. According to section 13(a)(1) of the Agreement, the annual payment

shall include, but not be limited to, that part of the interest, maintenance, and depreciation (or similar charges) to be borne by power under applicable law, and that part of the operation expenses (including land rentals and similar charges), administrative and general costs and taxes other than net income taxes to be borne by power.

No provision of the Agreement either expressly forbids or expressly requires the parties to adjust these payments retroactively.

When parties make payments to the United States, the BPA holds the money for the payor's credit until the Federal Energy Regulatory Commission [FERC] determines the amount due under section 10(f) of the Federal Power Act, 16 U.S.C. § 803(f). The FERC replaced the Federal Power Commission [FPC]. When the United States makes payments to the other parties, it converts the dollar amounts to kilowatt hours of electricity and credits those hours to the payee's exchange account according to an exchange contract between the payee and the BPA.

### B. *The First Land Rental Adjustment*

One of the hydroelectric projects governed by the Coordination Agreement is the Kerr Dam, which Montana Power operates under a license originally issued on May 23, 1930 for a term of fifty years. Because the dam is located on the Flathead Indian Reservation in Montana, Montana Power pays rent to the Confederated Salish and Kootenai Tribes [Confederated Tribes]. Article 30 of the license provides:

The annual charges payable [to the Confederated Tribes] under this license may be readjusted at the end of twenty (20) years after the beginning of operation under this license and at periods of not less than ten (10) years thereafter by mutual agreement between the [Federal Power] Commission and the Licensee, with the approval of the Secretary of the Interior ... [S]uch readjusted annual charges to be reasonable charges fixed upon ... the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development.

This provision echoes section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e) (requiring dam licensee to pay "reasonable annual charge" for tribal lands).

On May 19, 1959, the last day of the first twenty years of the Kerr Dam's operation, the Confederated Tribes asked the FPC to raise Montana Power's land rentals for the period from May 20, 1959 to May 19, 1969. On August 4, 1966 the FPC presiding examiner raised the annual rental payment from $238,375 to $850,000 and made the increase retroactive to May 1, 1959, adding interest of four per cent per annum.

On September 1, 1966 Montana Power met with the non-federal downstream parties to the Coordination Agreement and informed them that it would bill them for

the increased rentals. On the same day, the BPA met with the full contract committee for the Coordination Agreement and stated the position of the United States: that the FPC examiner's decision was not final, and that the parties should not include the increased rent in the Coordination Agreement payments until the FPC and the courts determined the amount.

But all the downstream parties (including the United States) did agree to pay the final rent increase, computed from the 1966–67 contract year. Since the United States did not wish to book a single, large credit of energy to Montana Power after the final determination, it agreed to add 100,000,000 kilowatt hours to Montana Power's exchange account each year pursuant to the exchange contract, and to make the necessary adjustments later.

After reviewing the examiner's decision, the FPC increased the annual rent by Montana Power to the Confederated Tribes to $950,000, computed from May 20, 1959, with simple interest of six per cent per annum. Judicial review ended on June 26, 1972, when the United States Supreme Court denied certiorari. Montana Power then paid $11,249,913.81 to the Treasury for the credit of the Confederated Tribes. The sum represented increased land rent from May 20, 1959 to May 19, 1969.

Montana Power billed the downstream parties for their share of the increase. The non-federal parties computed their shares from the 1966–67 contract year and refused to pay the increases for the years 1963–64 through 1965–66 (years covered by the Coordination Agreement but before the FPC examiner's decision). The United States, however, began to negotiate with Montana Power concerning both the increased rent and amendment of the exchange contract.

During the negotiations, the United States asked the Regional Solicitor of the Department of the Interior for his opinion. In a memorandum dated September 14, 1973, the Solicitor advised the United States to pay the rent increases retroactively for the contract years 1963–64

through 1965–66. Montana Power and the United States then added to their exchange contract the following provision, section 4(f) of Amendatory Agreement No. 4:

> The parties agree that additional Exchange Account credits for downstream benefits are due the Purchaser from the Administrator relating to increased Kerr Project land rental expenses for prior Contract Years under the Coordination Agreement as follows:

| Contract Years | Kilowatt Hours |
|---|---|
| 1963–64 to 1971–72 | 589,920,000 |

In August of 1975 the United States credited 589,920,000 kilowatt hours to Montana Power's account.

Meanwhile, on April 9, 1975, Montana Power sued the non-federal downstream parties in the United States District Court for the Eastern District of Washington, seeking retroactive rent payments for the years 1963–64 through 1965–66. On July 27, 1976 the district court granted summary judgment to the non-federal parties on these alternative grounds: 1) the statute of limitations barred Montana Power's claim; and 2) the Coordination Agreement did not provide for retroactive adjustment of costs. On December 18, 1978 the United States Court of Appeals for the Ninth Circuit affirmed the judgment on the second ground. *Montana Power Co. v. Public Utility District No. 2*, 587 F.2d 1019 (9th Cir.1978).

C. *The Second Land Rental Adjustment*

On May 28, 1975 the Confederated Tribes petitioned the FPC to raise the Kerr Dam land rent for the period beginning May 20, 1975 and ending May 23, 1980, the expiration of the lease. On June 18, 1975 Montana Power notified all parties to the Coordination Agreement that the Tribes had filed a new petition, and in its annual submission of Kerr Dam costs, Montana Power stated that Indian land rentals were subject to change.

After hearings before an administrative law judge and private negotiations, Montana Power and the Confederated Tribes reached a settlement, which the FERC ap-

proved on November 20, 1978. The settlement raised the annual rent from $950,000 to $2,600,000. It also required Montana Power to make a retroactive payment of increased land rent and interest for the period from May 20, 1975 through December 31, 1977. That payment amounted to $4,650,000.

On February 28, 1980 Montana Power billed the United States for a share of the increased rents retroactively imposed for the period from May 20, 1975 through contract year 1977–78. Montana Power reckoned that share to be 525,740,400 kilowatt hours, and suggested that the United States pay this increase following the procedures established after the first adjustment. But on March 21, 1980 the BPA replied, "we cannot justify consideration of such payments in light of the decision in *Montana Power Co. v. PUD No. 2 of Grant County*, 587 F.2d 1019."

In 1981, to compel payment of the retroactive rent increase, Montana Power sued all Coordination Agreement signatories, including the BPA, in the United States District Court for the Eastern District of Washington. By an order dated March 4, 1982, that court transferred the claim against the Government to the United States Court of Claims. The Government has counterclaimed to recover the retroactive rent payments it made for the years 1963–64 through 1965–66.

## DISCUSSION

According to the plaintiff, when the United States agreed to pay the first retroactive rent increase, it either recognized an obligation implicit in the Coordination Agreement, modified the agreement, or entered a new contract implied in fact. In any case, the plaintiff argues, the Government must pay the increased rent. According to the defendant, the Ninth Circuit's decision estops the plaintiff from raising this argument and entitles the United States to recover the first retroactive payment.

### A. *Collateral Estoppel*

In its first action against the non-federal parties, Montana Power relied on section 13(a)(1) of the Coordination Agreement, which requires payment of operational expenses "including land rentals and similar charges...." The district court granted summary judgment for the defendants. On appeal, the Ninth Circuit held that the Coordination Agreement itself does not require retroactive payments, and noted that Washington law prevented the district court from interpreting the contract with extrinsic evidence:

> Appellant argues that it should have the opportunity to prove through evidence of certain subsequent acts and statements by the PUDs [Public Utility Districts] that it was the intent of the parties in 1964 to allow retroactive adjustment of charges should there be a retroactive adjustment of Montana's rental payment to the Tribes. [citations omitted] We cannot agree. The agreements are clear, complete, and comprehensive; therefore, they are not subject to interpretation based on such extrinsic evidence. *Green River Foundation v. Foster*, 78 Wash.2d 245, 473 P.2d 844 (1970).

*Montana Power Co.*, 587 F.2d at 1021–22. Though the United States was not a party to the earlier suit, it hopes to use the judgment both defensively, to bar the plaintiff's claim, and offensively, to recover its own earlier payments. The U.S. Court of Claims permitted strangers to the first suit to invoke collateral estoppel in a second only if the issues in both suits were identical and the earlier suit was fully and fairly contested. To determine if that contest had been full and fair, the court considered several factors among which were the limitations of the prior forum and the differences in the applicable law. *See Hilkovsky v. United States*, 205 Ct.Cl. 460, 465, 504 F.2d 1112, 1114 (1974) (citing and approving *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 246 N.E.2d 725, 298 N.Y.S.2d 955 (1969)).

The plaintiff sued the non-federal defendants under Washington law. But

uniform federal "common law" governs the contracts of the United States; that law must take account of the best in modern decision and discussion. *E.g., Padbloc Co. v. United States,* 161 Ct.Cl. 369, 377 (1963). If federal law would have permitted the plaintiff to introduce its extrinsic evidence, the first judgment cannot estop the plaintiff here.

Washington courts strictly interpret the parol evidence rule and exclude extrinsic evidence unless the court finds an ambiguity on the face of the document. *See generally* Annot., 40 A.L.R.3d 1384, 1389–96 (1971) (discussing cases from various jurisdictions). Even members of the Washington Supreme Court have criticized this rule:

> The difficulty posed by feelings of judicial certainty in the face of contractual language of questionable meaning was well stated by Professor Corbin:
>
> "It is true that when a judge reads the words of a contract he may jump to the instant and confident opinion that they have but one reasonable meaning and that he knows what it is. A greater familiarity with dictionaries and the usages of words, a better understanding of the uncertainties of language, and a comparative study of more cases in the field of interpretation, will make one beware of holding such an opinion so recklessly arrived at."

*Green River Valley Foundation,* 78 Wash.2d at 254, 473 P.2d at 849 (concurrence) (quoting 3 A. Corbin, *Contracts* § 535 (1960) [Corbin]).

The Court of Claims preferred the modern view: At the very least, "[p]arol or extrinsic evidence *must* be admissible on the issue of the extent to which a written agreement is integrated, for as has been said, the writing cannot prove its own integration." *Sylvania Electric Products, Inc. v. United States,* 198 Ct.Cl. 106, 128, 458 F.2d 994, 1006 (1972) (emphasis added) (citing 3 Corbin § 582). *See generally United States v. Lennox Metal Manufacturing Co.,* 225 F.2d 302, 310–15, (2d Cir.

1955) (Frank, J.) ("Ambiguity-on-its face" rule is vestige of primitive law.).

■ Had Montana Power sued the United States before suing the non-federal parties, the Court of Claims would not have excluded the evidence with which Montana Power hoped to supplement the Coordination Agreement. But because state law bound the Ninth Circuit, Montana Power was never permitted to show how the parties understood their agreement. The issue was not fully and fairly litigated. Therefore, the earlier judgment does not preclude consideration of the issue here.

### B. *The Merits*

■ The parol evidence rule does not apply to this case since the plaintiff relies upon the defendant's behavior *after* execution of the contract to show what the contract language *means.* In this court, the rule prevents parties from *varying* integrated agreements with inconsistent prior or contemporaneous terms. *See, e.g., Sylvania,* 198 Ct.Cl. at 126, 458 F.2d at 1005. Even a completely integrated agreement must be interpreted, and a court may consider any evidence that assists it in this process. 3 Corbin § 579 at 413. The Court is free to consider the entire record.

The Coordination Agreement entitled Montana Power to reimbursement for "land rentals and similar charges." The Regional Solicitor for the Department of the Interior examined the Agreement and advised the Government to pay the rent increases retroactively to the date the Agreement was executed. The Government paid the increases; Montana Power accepted payment. "This practical interpretation of the contract by the parties, at a time when it was not a subject of controversy, is entitled to great, if not controlling, weight." *Inland Empire Builders, Inc. v. United States,* 191 Ct.Cl. 742, 755, 424 F.2d 1370, 1378 (1970) (citations omitted).

According to the defendant, however, Montana Power originally interpreted the Agreement to require increased payments only from the date of the examiner's deci-

sion (1966), not from the date of the Agreement (1963–64); therefore, the plaintiff cannot claim larger payments now. In a letter of August 25, 1966 to the BPA, Montana Power stated: "[T]he only way which Montana Power may be reimbursed under a final decision is to have the amount of the Presiding Examiner's decision included in annual costs *from the date thereof on,* with adjustments being made upon final determination." (emphasis added).

 This argument does not persuade the Court. The adjustments to be made upon final determination could include adjustments retroactive to 1963–64. Even if Montana Power at first believed itself entitled to collect increased rents only from the date that the FPC or FERC official enters a decision, nevertheless "[t]hose who enter a contract may take steps at any time after its execution to modify it." *General Dynamics Corp. v. United States,* 214 Ct.Cl. 607, 617, 558 F.2d 985, 990 (1977). The court can infer an agreement to modify existing obligations from the conduct of the parties after formation of the contract. *E.g., Ladum v. United States,* 5 Cl.Ct. 219, 223 (1984) (citing *Byers Transportation Co. v. Fourth National Bank and Trust Co.,* 333 F.2d 822, 825 (10th Cir.1964)); *see also* 3 Corbin § 564 at 297 (Party to a written agreement can always modify it by a tacit agreement in which his own promises are found wholly by inference from conduct other than words.).

If the Agreement did not entitle Montana Power to retroactive rent increases, then the Government's payment and Montana Power's acceptance modified the Agreement and imposed a new obligation.

## CONCLUSION

The parties' course of performance shows that the Coordination Agreement or a later modification obliges the defendant to pay the retroactive rent increases that the plaintiff demands. Since the Agreement itself entitles the plaintiff to judgment, the Court does not consider whether the parties entered a separate contract implied in fact. The Court grants the plaintiff's motion for summary judgment on the issue of liability, and denies the defendant's cross motion and counterclaim. The Court will schedule further proceedings within the next 30 days with regard to the issue of damages.